RENDERED: FEBRUARY 18, 2016
TO BE PUBLISHED

# Supreme Court of Kentucky

2015-SC-000086-CL

FINAL

DATE 3-10-16 EwtGrawtP.C.

IN RE:

ROBERT A. WINTER, JR., PLAINTIFF

AND

CAMERON BLAU AND
HONORABLE ALLISON JONES,
INTERVENING PLAINTIFFS

|  | THE UNITED STATES DISTRICT COURT |
| --- | --- |
| V. | EASTERN DISTRICT OF KENTUCKY, NORTHERN DIVISION |
|  | COVINGTON, CIVIL NO. 14-119-ART |

HONORABLE STEPHEN D. WOLNITZEK,
IN HIS OFFICIAL CAPACITY AS CHAIR,
JUDICIAL CONDUCT COMMISSION, ET AL.

## OPINION OF THE COURT BY JUSTICE VENTERS

### CERTIFYING THE LAW

Pursuant to CR 76.37(1), we granted the certification request of the United States District Court for the Eastern District of Kentucky (District Court), to provide the answer under Kentucky law to the following three questions and the associated sub-questions:

Question 1:

Canon 5A(1)(a) states that a judge or judicial candidate shall not "campaign as a member of a political organization." What constitutes "campaign[ing] as a member of a political

organization"? As applied to this case, would it include a candidate's statements in mailers identifying his political party, such as "I am the only Republican candidate for Judge" or "I am the Conservative Republican candidate for Judge"? Would a candidate's statement that his opponent was "the Democrat candidate for Judge" or the "Liberal Democrat for Judge" violate the Canon?

Question 2:

Canon 5A(1)(b) states that a judge or judicial candidate shall not "act as a leader or hold any office in a political organization." What constitutes "act[ing] as a leader or hold[ing] any office"? As applied to this case, would hosting events for a political party violate the Canon?

Question 3:

Canon 5B(1)(c) states that a judge or judicial candidate "shall not knowingly, or with reckless disregard for the truth, misrepresent any candidate's identity, qualifications, present position, or make any other false or misleading statements." What constitutes a false statement? As applied to this case, would it include a candidate who asks voters to "re-elect" her to a second term even though she was appointed to her first term?

These canons were promulgated by this Court with the objective of complying with Section 117 of our Constitution requiring that "Justices of the Supreme Court and judges of the Court of Appeals, Circuit and District Court *shall be elected* from their respective districts or circuits *on a nonpartisan basis* as provided by law." (Emphasis added.) We interpret this provision of the Kentucky Constitution as directing that Kentucky's judicial elections be nonpartisan in truth and substance, and not merely in process and procedure by the superficial omission of a political party designation on the voting ballot. Accordingly, we provide the following certification of Kentucky law in response to the District Court's questions.

2

## I. FACTUAL AND PROCEDURAL BACKGROUND

Robert A. Winter, Jr., filed to run in the May 2014 primary election as a candidate for circuit court judge in the 16th Judicial Circuit (Campbell County). As part of his campaign strategy, Winter mailed brochures to registered Republican voters identifying himself as a registered Republican and, conversely, identifying his opponents as registered Democrats. After the brochures were sent out, the Kentucky Judicial Conduct Commission (JCC) notified Winter that it had received complaints that his brochures violated the Kentucky Code of Judicial Conduct. Winter responded in June 2014 by filing suit in the District Court against the JCC challenging the constitutionality of Canons 5A(1)(a) (prohibiting judges and judicial candidates from campaigning as a member of a political organization) and 5B(1)(c) (prohibiting judges or judicial candidates from making "false" or "misleading" statements).

During the same election cycle, Cameron Blau entered the race as a candidate for district court judge in the 17th Judicial District (Campbell County). Because Blau likewise intended to openly campaign as a Republican and send brochures likewise identifying himself as a Republican, in October 2014, Blau filed an intervening complaint to join Winter's challenge to Canons 5A(1)(a) and 5B(1)(c). As relevant here, Blau also challenged the constitutionality of Canon 5A(1)(b) (a judicial candidate shall not "act as a leader or hold any office in a political organization"). In his complaint, Blau stated that he wanted to send out brochures to potential voters identifying himself as "the only Republican candidate for Judge," or "the Conservative

3

Republican candidate for Judge" and identifying his opponent as "the Democrat candidate" or the "Liberal Democrat for Judge." Blau also indicated in his complaint that he wanted to seek the endorsement of the local Republican Party, host events for the local Republican Party, and make political donations to members of the Republican Party.[1] In a lengthy order preliminarily addressing the constitutionality of the canons under review (the Injunction Order), the District Court concluded that there was a likelihood that each of the canons at issue was unconstitutional, and granted Blau's motion to prevent the JCC from enforcing the canons against him in the November 2014 election.

Allison Jones was appointed by Governor Steve Beshear to the Kentucky Court of Appeals in July 2013. To retain the office to which she was appointed, Jones became a candidate in the November 2014 General Election. In October 2014, the JCC received a complaint alleging that Judge Jones had made false and misleading statements in speeches and campaign materials. The "false and misleading statements" referred to Jones' use of the word "re-elect" to describe her effort to retain the judicial position to which she had been appointed rather than "elected." Jones then intervened in Winter's District Court action, contending that Canon 5B(1)(c) (prohibiting false statements) was unconstitutional. The only issue presented in Jones' portion of the case is whether an incumbent judge who was appointed to office may properly use the

---

[1] Blau also raised constitutional challenges to other judicial canons not at issue in the questions of law presently before us.

4

word "re-elect" to describe her effort to retain the office to which she was appointed but not elected.

It is within the context of this litigation that the District Court requested that we certify the law on the questions addressed herein.

## II. GENERAL CONSIDERATIONS

We begin with a few general considerations that guide our examination of the questions presented by the District Court. First, pursuant to the Kentucky Constitution, all judges and justices at every level of the state judiciary are selected by ballots cast by the people of Kentucky. Ky. Const. § 117. Thus, we recognize that the judicial canons we address in this decision were designed to serve the state's compelling interest of encouraging an unbiased and impartial judiciary for the Commonwealth, and that the Commonwealth's interest is offset by restricting the political speech of only the few who volunteer to be a candidate for office, not their supporters, advocates, and non-candidate adversaries.

The ultimate objective of our system of judicial selection is to achieve a delicate balance. On one side of the scales, we must foster and protect the people's prerogative to choose by direct vote the judges that preside locally and statewide. On the other side of the scales, we must create a political environment in which judges selected by the citizens are not tethered, or beholden to partisan political factions and their associated creeds. And, we must do so in a way that preserves the judiciary as an institution that is not partial to or biased against any political faction.

5

The federal judicial system achieves this balance by an effective but different approach. Rather than selecting judges by popular election, the federal system selects judges by the collaborative effort of the political branches, the executive and the legislative, based upon any and all factors including the nominee's political ties, beliefs, and political ideologies. The federal system achieves its assurance that judges are not beholden to political interests and factions by appointing them for life. With the lifetime tenure, federal judges are liberated from any ties or allegiance to the political factions that supported their ascension, and that might otherwise seek to influence them.

The federal system secures the government's vital interest in an independent judiciary at the expense of the people's ability to choose and replace their judges. Kentuckians, like the citizens of most states, chose to achieve the same balance by alternate means. We have judges who must earn the public's respect and maintain the public's confidence by periodically entering and re-entering the arena of elective politics. Kentucky, like most states, assures the impartiality and integrity of the judiciary, not with a lifetime appointment, but through moderate restrictions on partisan activities set out in canons of conduct. The judicial canons at issue in this case perform the same function of keeping judges free from the potentially corruptive influences and appearances of partisan politics accomplished in the federal system by the lifetime tenure of judges. As such, the canons that make up our Code Judicial

Conduct advance a laudable and necessary goal that serves a vital interest of this Commonwealth.

In the discussions of the judicial canons at hand, we are mindful that the public's trust in, and respect for, its judiciary is at stake. We accordingly are constrained to undertake a narrow view of those canons as we answer the questions posed by the District Court. At the same time we provide an interpretation that complies with controlling First Amendment case authorities, strict scrutiny, and other relevant, constitutional principles relating to vagueness, overinclusiveness, and underinclusiveness.

## III.   STANDARDS OF REVIEW

Our canons of judicial conduct are set forth in Supreme Court Rule (SCR) 4.300. The preamble to the canons states in part:

> The Code of Judicial Conduct is intended to establish standards for ethical conduct of judges. It [of necessity] consists of broad statements . . . .
>
> . . . .
>
> The Canons and Sections are rules of reason. They should be applied consistent with constitutional requirements, statutes, other court rules and decisional law and in the context of all relevant circumstances . . . .

This litigation concerns the restrictions on the speech of judicial candidates in judicial elections. Because the First Amendment[2] reviles

---

[2] The First Amendment provides that Congress "shall make no law . . . abridging the freedom of speech." The Fourteenth Amendment makes that prohibition applicable to the States. *Stromberg v. California*, 283 U.S. 359, 368 (1931).

restrictions on core political speech,[3] such restrictions are subject to the strict scrutiny standard. *Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656, 1665 (2015).[4] Under the strict scrutiny standard, "[a] State may restrict the speech of a judicial candidate only if the restriction is narrowly tailored to serve a compelling interest." *Id.* Prior authorities have identified and held that there is a compelling governmental interest in encouraging an unbiased and impartial judiciary and in maintaining the integrity of the judiciary. *See id.* at 1666 (States have a compelling interest in preserving public confidence in the integrity of the judiciary). Those are precisely the interests addressed in the canons under review.

We interpret the law, including the judicial canons now under review, by applying the plain and ordinary meaning of relevant text. *Pearce v. University of Louisville, by & through its Board of Trustees*, 448 S.W.3d 746, 749 (Ky. 2014).[5] We fundamentally undertake to construe the law so as to avoid an unconstitutional result. *Caneyville Volunteer Fire Department v. Green's Motorcycle Salvage, Inc.*, 286 S.W.3d 790, 806 (Ky. 2009); *Ballinger v.*

---

[3] Speech concerning public issues and the qualifications of candidates for elective office commands the highest level of First Amendment protection. *See Eu v. San Francisco County Democratic Central Committee.*, 489 U.S. 214, 223 (1989).

[4] This holding appears in Section II of *Williams-Yulee*, which was joined by only four Justices. However, the four dissenters likewise agree that strict scrutiny is the proper standard of review of laws constraining judicial campaign speech. Accordingly, it is now definitively established that strict scrutiny is the proper standard of review in judicial electioneering cases.

[5] Of course, there is an obvious difference between our interpretation of legislative acts, in which our principal objective is to determine the intent of another body; here, the judicial canons we interpret were promulgated by this Court, and thus in this sense we are interpreting our own work.

*Commonwealth*, 459 S.W.3d 349, 354 (Ky. 2015) (citations omitted). Of course this fundamental rule of construction also applies to the interpretation of the rules we promulgate. *Summe v. Judicial Retirement and Removal Commission*, 947 S.W.2d 42, 47 (Ky. 1997). Moreover, we accede to the decisions of the federal courts addressing important First Amendment issues relating to judicial candidate electioneering. Because recent federal decisions guide our interpretation of the canons at issue, we begin with a brief overview of their central holdings.

In *Republican Party of Minnesota v. White*, 536 U.S. 765 (2002), the Supreme Court struck down a Minnesota judicial canon which prohibited candidates for judicial election from announcing their views on disputed legal or political issues. Proponents of the canon argued that it survived the strict scrutiny test because it served the compelling governmental interest of preserving the appearance of an impartial judiciary. The Court, however, concluded that the canon failed the strict scrutiny test because it did not advance the proffered interest. The Court held that the canon did not preserve the appearance of an impartial judiciary because it did not restrict speech advocating for or against particular parties or political factions; rather, it restricted candidates from expressing their own personal opinions on popular issues. The Court found no compelling state interest in suppressing judicial candidates' views on such issues.[6]

---

[6] *See also J.C.J.D. v. R.J.C.R.*, 803 S.W.2d 953 (Ky. 1991) (Panel of Special Justices) (Code of Judicial Conduct provision prohibiting all discussion of judicial

9

In *Family Trust Foundation of Kentucky v. Wolnitzek*, 345 F. Supp. 2d 672 (E.D. Ky. 2004), the District Court considered Kentucky's Judicial Canon 5B(1)(c), which provided, in relevant part, that a judge or candidate to judicial office "shall not make pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office; [and] shall not make statements that commit or appear to commit the candidate with respect to cases, controversies or issues that are likely to come before the court[.]" In striking down the canon, the District Court held that the canon was unconstitutionally overbroad in that it was not limited to a ban on promises or commitments by candidates to rule a certain way on cases likely to come before them (which would be sustainable as furthering a compelling government interest in securing judicial open mindedness), and it consequently stifled the right of judges and candidates to speak out on issues and the corresponding right of voters to hear their views. Consistent with that determination the decision further held that judicial candidates cannot be prohibited from responding to election issue questionnaires inquiring into their positions on public issues.

In *Carey v. Wolnitzek*, 614 F.3d 189 (6th Cir. 2010), the Sixth Circuit Court of Appeals held that a former version of Kentucky Judicial Canon 5A(2), which prohibited judges and judicial candidates from disclosing their party

---

candidate's views on disputed legal or political issues unnecessarily violated constitutional free speech rights of judicial candidates).

10

affiliation in any form of advertising, or when speaking to a gathering, except in answer to a direct question by a voter in one-on-one or very small private informal settings, was unconstitutional because it was not narrowly tailored to advance the Commonwealth's interest in preventing a biased judiciary, or diminishing the role of political parties in judicial selection, and thus the canon facially violated free speech and associational rights. The Sixth Circuit reasoned that by prohibiting candidates from disclosing their party affiliations, the clause effectively prevented candidates from announcing their individual views on many issues to the extent that a party identification signals the judicial candidate's alignment with the views incorporated into a political party's platform. The decision further held that the canon was underinclusive for these additional reasons: the identification of the candidate's party affiliation was forbidden only when the candidate raised the point and could otherwise be disclosed by the candidate's supporters; judicial candidates were not restrained from disclosing their memberships or affiliations with other types of organizations that advocated political opinions, such as the Federalist Society or the ACLU, which may be more telling than one's actual party identification itself; and the canon did not prohibit judicial candidates from *being* members of a political party. Rather, it only prohibited them from announcing their particular party membership.[7]

---

[7] *Carey* also held that our canon prohibiting a judicial candidate from personally soliciting funds was unconstitutional; however, that holding has been superseded by *Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656 (2015) (upholding restrictions on a judicial candidate's personal solicitation of campaign funds).

11

Most recently, and perhaps most importantly, the Supreme Court decided in *Williams-Yulee* that a Florida judicial canon restricting a judicial candidate's personal solicitation of campaign funds was constitutional because it was narrowly tailored to serve the compelling governmental interest in obviating the indecorous practice of an attorney who regularly practiced before a judge, or a litigant with a case pending before a judge, personally handing cash to the judge or being placed in the untenable position of rebuffing the judge's personal solicitation. *See also Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 889 (2009) (holding that there is serious risk of actual bias, based on objective and reasonable perceptions, when a person with a personal stake in a particular case has significant and disproportionate influence in placing a judge on the case by raising funds, or by directing a judge's election campaign, when the case was pending or imminent).

With the above standards and constitutional limitations in mind, we now turn to the particular questions posed by the District Court in its certification of law request.

## IV. QUESTION I – CANON 5A(1)(A)

The District Court's first question seeks certification of a broadly-stated question along with two more specific subparts. Canon 5A(1)(a) states as follows:

> Canon 5. A judge or judicial candidate shall refrain from inappropriate political activity.
>
> A. Political Conduct in General.

12

> (1) *Except as permitted by law*, a judge or a candidate for election to judicial office shall not:
>
> (a) campaign as a member of a political organization[.]

(Emphasis added.) The section is further clarified by the following official commentary:

> A judge or a candidate for election to judicial office retains the right to participate in the political process as a voter. A judge or a candidate for election to judicial office may publicly affiliate with a political organization but may not campaign as a member of a political organization.

Because the specific prohibition contained in Canon 5A(1)(a) (shall not . . . campaign as a member of a political organization) is limited by the introductory clause "except as permitted by law," our interpretation of the section is guided by the various First Amendment court decisions addressing judicial campaign issues as referenced above.

## A. Answer to Question 1: What constitutes "campaign[ing] as a member of a political organization"?

The Terminology Section of SCR 4.300 defines a "political organization" as "denot[ing] a political party or other group, the principal purpose of which is to further the election or appointment of candidates to political office." The Democrat and Republican parties clearly fall within this definition. *Carey* held that a judicial candidate cannot be restrained from identifying himself as a member of a political party, and our current version of Canon 5 was promulgated in response to that decision. It follows that the canon does not, and indeed could not, reach that activity. In summary, a judicial candidate may identify himself to the public as a member of a political party. *Carey v.*

13

*Wolnitzek*, 614 F.3d 189; Commentary to Canon 5 ("a candidate for election to judicial office may publicly affiliate with a political organization").

Nevertheless, there is a vast difference between the permissible speech of a judicial candidate identifying herself as a *member* of a political party and the impermissibly deceptive conduct of representing herself as *the nominee* of a political party. The former statement would be true; the latter is by any standard, blatantly false. Canon 5A(1)(a) draws that distinction.

The Canon 5 provision proscribing "campaigning as a member of a political organization" prohibits the dissemination of campaign materials and other public representations suggesting to the voters that the candidate is *the* endorsed judicial nominee of a political party. For example, a campaign representation such as "I am *the* Republican candidate for the 16th Judicial Circuit Court" is impermissible. There is no "Republican candidate" for that office; the assertion is materially false and misleading. *See* Canon 5B(1)(c) (prohibiting materially false statements). Political parties and factions do not select or nominate candidates for judicial office in Kentucky. Canon 5A(1)(a) merely recognizes and faithfully codifies this Constitutional reality.

B. **Answer to Question 1A: As applied to this case, would it include a candidate's statements in mailers identifying his political party, such as "I am the only Republican candidate for Judge" or "I am the Conservative Republican candidate for Judge"?**

As noted above, pursuant to *Carey*, prohibiting a judicial candidate from identifying himself as a member of a political party is unconstitutional and the present version of Canon 5A(1)(a) was drawn to comply with *Carey*. Therefore, the statement "I am the only Republican candidate for Judge" is permissible, as

14

long as it is true, because the message merely identifies the candidate as *a* Republican who is a candidate for judge, albeit the only one. It does not imply that the candidate is *the* nominee of the Republican Party, which would be prohibited.

In contrast, the statement "I am *the* Conservative Republican candidate for Judge," transmits the message that the candidate is the formal nominee for the Republican Party. As discussed above, this is an impermissible depiction by the candidate of his status in the judicial race; the insertion of the modifier "Conservative" into the statement does not, in our view, dispel the disingenuousness of the statement. Under the current state of affairs of modern American politics, the Republican Party is commonly regarded as occupying the conservative side of the political spectrum, and so the addition of the modifier "Conservative" is surplusage, doing nothing to dispel the implied falsehood that the candidate is running for Kentucky judicial office as the formal candidate of the Republican Party.

## C. Answer to Question 1B: Would a candidate's statement that his opponent was "the Democrat candidate for Judge" or the "Liberal Democrat for Judge" violate the Canon?

The statement by a candidate that his opponent is "*the* Democrat candidate for Judge" is an impermissible message to the voters. His opponent is not, in fact, *the* Democrat candidate for Judge. As previously explained, such candidates do not exist in Kentucky, and such a campaign message would therefore amount to a blatant falsehood. *See* Canon 5B(1)(c) (prohibiting materially false statements).

15

Similarly, a statement by a candidate that his opponent is *"the* Liberal Democrat for Judge"* is likewise impermissible. For the identical reasons discussed above, the modern Democratic Party is widely acknowledged as falling within the liberal segment of the political spectrum. There is no meaningful difference between stating that someone is *"the* Liberal Democrat for Judge"* as opposed to *"the* Democrat for Judge."* Both phrasings imply the false and misleading message that the opponent is *the* Democratic Party nominee for judge.

## D. Summary

In summary, judicial candidates may "affiliate,"[8] that is "portray" themselves as members of a political party without restriction; what they may not do under Canon 5A(1)(b), in tandem with Canon 5B(1)(c), is portray themselves, either directly or by implication, as the official nominee of a political party.

## V. QUESTION 2 – CANON 5A(1)(B)

The second question concerns Canon 5A(1)(b). This Canon states as follows:

> Canon 5. A judge or judicial candidate shall refrain from inappropriate political activity.
>
> A. Political Conduct in General
>
> (1) Except as permitted by law, a judge or a candidate for election to judicial office shall not:

---

[8] *Merriam-Webster* defines "affiliate" as "to closely connect (something or yourself) with or to something (such as a program or organization) as a member or partner[.]" http://www.merriam-webster.com/dictionary/affiliate (January 2016).

. . .

(b) act as a leader or hold any office in a political organization.

## A. Answer to Question 2: Canon 5A(1)(b) states that a judge or judicial candidate shall not "act as a leader or hold any office in a political organization." What constitutes "act[ing] as a leader or hold[ing] any office"?

"Holding any office" in a political organization means occupying a formal position with a recognized title or performing a function within the established organizational structure of an association whose principal purpose is to further the election or appointment of candidates to political office. An "office" in such an organization includes recognized titles such as chairman, director, secretary, treasurer, press secretary, precinct leader, membership recruiter, youth coordinator, and the like.

"Acting as a leader" encompasses a less formal but broader range of participation. *Matter of Disciplinary Proceeding Against Blauvelt*, 801 P.2d 235, 238 (1990),[9] notes that *Webster's Third New International Dictionary* 1283 (1986), defines *leader*, among other ways, as "a person who by force of example, talents, or qualities of leadership plays a directing role, wields commanding influence, or has a following in any sphere of activity or thought." "Acting as a leader," therefore, captures efforts to advance the political agenda of the party in a less formal way through proactive planning, organizing,

---

[9] *Blauvelt* addressed a judicial canon substantially identical to Canon 5A(1)(b) and held that a judge serving as a delegate to political party's county convention was a "leader" within meaning of the canon's prohibition against a judge acting as a "leader" in a political organization.

17

directing, and controlling of party functions with the goal of achieving success for the political party. These less formalized, leader-without-title, positions would include, for example, acting formally or informally as a party spokesperson; organizing, managing, or recruiting new members; organizing or managing campaigns; fundraising; and performing other roles exerting influence or authority over the rank and file membership albeit without a formal title, including as further discussed below, hosting political events.

## B. Answer to Question 2A: As applied to this case, would hosting events for a political party violate the Canon?

Consistent with the definition of "acting as a leader," as just discussed, one who hosts an event for a political party is "acting as a leader" for the party. *Merriam-Webster* defines "host" as: "1 a: one that receives or entertains guests socially, commercially, or officially; b: one that provides facilities for an event or function . . . ."[10] Therefore, someone who provides the facilities for an event of a political party or officially receives the political party attendees is, indeed, acting as a "leader" of a political party. The "host" of an event, political or otherwise, uses the prestige of his or her name to promote the event and exerts a significant measure of control and authority over the event, more so, in our view, than the more passive political delegate function in *Blauvelt*. Perforce, a judicial candidate hosting a political event acts as a leader of that event and is, in turn, acting as a leader of the political party on whose behalf the political event is being held. Under Canon 5A(1)(b) that is prohibited conduct.

---

[10] http://www.merriam-webster.com/dictionary/host (January 2016).

The final questions posed by the District Court concern the misleading speech prohibition by a judicial candidate contained in Canon 5B(1)(c). Canon 5B(1)(c) provides, in relevant part, as follows:

> B. Campaign Conduct.
>
> (1) A judge or candidate for election to judicial office:
>
> . . .
>
> (c) shall not . . . with reckless disregard for the truth, misrepresent any candidate's identity, qualifications, present position, or make any other false or misleading statements.

**A. Answer to Question 3: Canon 5B(1)(c) states that a judge or judicial candidate "shall not knowingly, or with reckless disregard for the truth, misrepresent any candidate's identity, qualifications, present position, or make any other false or misleading statements." What constitutes a false statement?**

A false[11] statement is a statement that is not factually true in the normal sense; that is, an untrue utterance. For example, it would include such statements as: "I graduated first in my class" when the candidate did not; "I have won all of my cases as an attorney" when the candidate had not; "I was an officer in the military" when the candidate was not; or "my opponent was convicted of a drug offense" when the opponent was not.[12]

---

[11] *Merriam-Webster* defines false as "not real or genuine: not true or accurate; *especially*: deliberately untrue: done or said to fool or deceive someone." http://www.merriam-webster.com/dictionary/false (January 2016).

[12] In *United States v. Alvarez*, 132 S. Ct. 2537 (2012), the Supreme Court held that false statements generally are not a category of unprotected speech exempt from the normal prohibition on content-based restrictions. *Id.* at 2547 (striking down a federal statute which prohibited lying about military awards). (Per opinion of Justice Kennedy, with three Justices concurring and two Justices concurring in the

The provision does not, however, cover expressions of opinion because expressions of an *opinion* do not implicate a statement that is not factually true. For example such statements as "Justice Stevens was the best Justice ever"; "*Citizens United* was the best decision ever"; or "my opponent is too liberal" are all expressions of opinion and not subject to Canon 5B(1)(c).

In summary, Canon 5B(1)(c) extends only to statements made during a campaign which are objectively factually untrue and do not extend to expressions of subjective opinions or innocuous campaign-trail "puffing" ("I am the most qualified candidate in the state.").

## B. Answer to Question 3A: As applied to this case, would it include a candidate who asks voters to "re-elect" her to a second term even though she was appointed to her first term?

The prefix "re" affixed to a verb implies that the action described in the verb has occurred on a previous occasion.[13] For example, if a television network announces that it will *rerun* a particular program, it has implicitly but definitively asserted that the program had been run on a prior occasion; it is implied that a soldier who *re-enlists* in the army had enlisted in the military on a prior occasion; and something can be *reasserted* only if it has previously been *asserted*.

---

judgment). However, the Court pointedly exempted from the scope of the decision laws aimed at "maintain[ing] the general good repute and dignity of . . . government . . . service itself." *Id.* at 2546 (citing *United States v. Lepowitch*, 318 U.S. 702, 704, 63 S. Ct. 914, 87 L.Ed. 1091 (1943)). Because the canons we address fall squarely within this exception, we are persuaded that *Alvarez* does not apply here.

[13] *See generally* http://www.merriam-webster.com/dictionary/re (January 2016).

Given this universally accepted convention of the English language, a candidate's request for voters to *re-elect* her to a judicial office is an affirmative assertion that she had been *elected* by voters to the same office on a prior occasion. A judge who holds her office by way of a gubernatorial appointment cannot honestly claim that she was *elected* to the office, and if she seeks to retain the office at the next election, she cannot honestly assert that she seeks to be *re-elected*. Such an assertion would be a materially false statement, deceptive to the public, and would run afoul of Canon 5B(1)(c).

The opponents of the canon cite to various court decisions and news articles where the term "re-elect" was used to describe a judge who was seeking to retain an office attained by appointment rather than election. Using the term in news articles and other narratives to chronicle historic events is an informal and idiomatic phrasing, but it is nonetheless inaccurate.

In contrast, when an incumbent judge uses the word "re-elect" as campaign stratagem to persuade the public that she acquired the office by the popular vote of the people rather than as the appointee of a governor, its use is calculated to mislead and deceive the voters. Accordingly, we distinguish these informal, idiomatic usages and regard these journalistic references as irrelevant to our review.

## VII.    CONSTITUTIONAL REVIEW

The closing step to interpreting a statute or other legal authority, such as the canons interpreted herein, is undertaking a final examination to ascertain that our interpretation complies with any existing constitutional mandates. We

21

have undertaken that review and are satisfied that our interpretations as expressed above fall well within the requirements of *White, Carey, Williams-Yulee,* and other applicable First Amendment authorities.

Nevertheless, we are attentive that in its Injunction Order, the District Court expressed its skepticism regarding the constitutionality of each of the canons under review. In response to that skepticism, we emphasize that we are persuaded that *Williams-Yulee* resolves the District Court's criticism in favor of the interpretations expressed herein. For example, the District Court criticizes our campaign limitation, expressed in Canon 5A(1)(a), as being underinclusive[14] because it fails to address the practical reality that, in lieu of the candidate directly portraying himself as the favored candidate of a political party, his supporters and surrogates may undertake that same function. The District Court is correct; we do not purport to limit the campaign conduct of supporters and surrogates. But the Court's criticism ignores the fact that the compelling interest served by our canon is to insulate the judge personally from behaviors that directly undermine the impartiality and objectivity of the Kentucky Court of Justice. That others outside the judiciary may pursue these political objectives on behalf of the judge or judicial candidate does not in any way diminish our objective. If anything, it is a factor that favors the constitutionality of our canon by emphasizing its limited impact on political

---

[14] "[U]nderinclusiveness can raise 'doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint.'" *Williams-Yulee,* 135 S. Ct. at 1668.

22

discourse. The objective is not to keep information hidden from the public; the objective is to keep the judge from compromising his or her integrity and impartiality by engaging in deceptive and misleading conduct.

*Williams-Yulee* presented a very similar situation. While the Florida rules prohibited a judge from personally soliciting funds, responsible representatives were permitted to do so on her behalf. Against the underinclusiveness argument, the United States Supreme Court noted: "A State need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns. We have accordingly upheld laws—even under strict scrutiny—that conceivably could have restricted even greater amounts of speech in service of their stated interests." 135 S. Ct. at 1668. By the same force of reasoning, our Canon 5A(1)(a) is not underinclusive;[15] nor are the other judicial canons we have discussed.

The District Court likewise criticizes our canons as overbroad in that they may be construed to extend beyond the range of prohibitable speech and reach non-prohibitable speech.[16] In drafting our canons, we strived to avoid overbreadth and the clarifications expressed herein should obviate that concern. In any event, *Williams-Yulee* addressed the same point and the same

---

[15] And further, of course we have no jurisdiction over the judicial candidate's supporters and surrogates; however that does not mean we are powerless over those whom we do have jurisdiction from misleading the public into believing that they are the officially sanctioned nominee of a political party.

[16] The overbreadth doctrine "is predicated on the danger that an overly broad statute, if left in place, may cause persons whose expression is constitutionally protected to refrain from exercising their rights for fear of criminal sanctions." *Massachusetts v. Oakes*, 491 U.S. 576, 581 (1989).

23

compelling interests were at stake. There, the Supreme Court observed that "The First Amendment requires that [the personal solicitation canon] be narrowly tailored, not that it be 'perfectly tailored.' The impossibility of perfect tailoring is especially apparent when the State's compelling interest is as intangible as public confidence in the integrity of the judiciary." 135 S. Ct. at 1671 (citation omitted). The same principle applies in this situation as we strive to protect the democratic ideal of citizens choosing their judges and, at the same time, preserve the neutrality of the judicial branch by insulating judges from detrimental influences of partisan politics. Perhaps we have not achieved the ideal-but-elusive "perfect tailoring," but nevertheless our tailoring comports with the standard prescribed in *Williams-Yulee.*

The District Court also suggests in its Injunction Order that the canons at issue are unconstitutionally vague;[17] however, as we discuss herein, a plain, ordinary, and common sense application of the language of the canons gives accurate guidance to a judicial candidate of what he may or may not do in a political campaign: he may not campaign as the nominee of a political party; he may not act as an office holder or leader, in the traditional sense of those terms, of a political party and he may not lie to the public on the campaign trail, although he is free to otherwise express his opinion on matters relating to himself, his opponent, and matters of public interest. It bears emphasis as

---

[17] "[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357 (1983).

24

well that Kentucky's Judicial Conduct Commission maintains an ethics advisory structure which is available to judicial candidates seeking specific advice or guidance on campaign matters.

## VIII. CONCLUSION

The law as set forth above is hereby certified to the United States District Court for the Eastern District of Kentucky.

All sitting. Minton, C.J.; Cunningham, Hughes, Keller, and Venters, JJ., concur. Noble, J., concurs in part and dissents in part by separate opinion in which Wright, J., joins.

NOBLE, J., CONCURRING IN PART AND DISSENTING IN PART: I concur with Justice Venters' excellent analysis on all the issues in this case except for his answer to question 1A, as to whether the statement "I am the only Republican candidate for judge" is permissible. I do not think it is. In the same discussion, he concludes that it is NOT permissible to say, "I am the conservative Republican candidate for judge." Both the term "only" and the term "conservative" are modifiers and immediately precede the phrase "Republican candidate." Thus, whatever the modifier may be, both sentences are discussing "the...Republican candidate." As the majority explains, Republicans (Democrats) do not have a party candidate in non-partisan judicial elections, and saying that one is "*the* Republican candidate" is inappropriate and misleading. I can make no distinction between the two sentences at issue, and thus would find that neither is permissible. Our Constitution requires that judicial candidates be non-partisan candidates, and declaring oneself to be any

25

kind of Republican (or Democratic) candidate adds partisanship to the actual candidacy, rather than stating in which political party one has membership.

Wright, J., joins.

COUNSEL FOR CAMERON BLAU:

Jack Scott Gatlin
Freund, Freeze, and Arnold

Christopher D. Wiest
Chris Wiest, Attorney at Law, PLLC

COUNSEL FOR ALLISON JONES:

Lucinda C. Shirooni
Thomas B Bruns
Jack Scott Gatlin
Freund, Freeze & Arnold

COUNSEL FOR HON. STEVEN D. WOLNITZEK, IN HIS OFFICIAL CAPACITY AS
CHAIR, JUDICIAL CONDUCT COMMISSION:

Jeffrey C. Mando
Louis Kelly
Adams, Stepner, Woltermann & Dusing, PLLC

Mark Richard Overstreet
Bethany A. Breetz
Stites & Harbison, PLLC