RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0206p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ROBERT A. WINTER, JR.,
        *Plaintiff-Appellee/Cross-Appellant,*

CAMERON A. BLAU; ALLISON JONES,
  *Intervening Plaintiffs-Appellees/Cross-Appellants,*

      *v.*

STEVEN D. WOLNITZEK; JANET L. STUMBO; EDDY
COLEMAN; DAVID PAUL BOWLES; DIANE E.
LOGSDON; JOYCE KING JENNINGS; JIMMY SHAFFER,
      *Defendants-Appellants/Cross-Appellees.*

Nos. 16-5836/5839/5841

---

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 2:14-cv-00119—Amul R. Thapar, District Judge.

Argued: August 4, 2016

Decided and Filed: August 24, 2016

Before: COLE, Chief Judge; SUTTON and COOK, Circuit Judges.

---

## COUNSEL

**ARGUED:** Jeffrey C. Mando, ADAMS, STEPNER, WOLTERMANN & DUSING, PLLC, Covington, Kentucky, for Appellants/Cross-Appellees. Mark R. Overstreet, STITES & HARBISON, PLLC, Frankfort, Kentucky, for Appellants/Cross-Appellees as to all claims except those asserted by Judge Jones. Christopher Wiest, CHRIS WIEST, AAL, PLLC, Crestview Hills, Kentucky, for Appellees/Cross-Appellants. **ON BRIEF:** Jeffrey C. Mando, ADAMS, STEPNER, WOLTERMANN & DUSING, PLLC, Covington, Kentucky, for Appellants/Cross-Appellees. Mark R. Overstreet, STITES & HARBISON, PLLC, Frankfort, Kentucky, Bethany A. Breetz, STITES & HARBISON, PLLC, Louisville, Kentucky, for Appellants/Cross-Appellees as to all claims except those asserted by Judge Jones. Christopher Wiest, CHRIS

1

WIEST, AAL, PLLC, Crestview Hills, Kentucky, Jack S. Gatlin, GATLIN VOELKER, PLLC, Ft. Mitchell, Kentucky, for Appellees/Cross-Appellants.

———————————

**OPINION**

———————————

SUTTON, Circuit Judge.  One sitting judge and two aspiring judges from Kentucky wish to exercise their free-speech rights during this and future judicial elections.  They claim that the Commonwealth's Code of Judicial Conduct stands in the way.  They are not the first judges to bring this kind of complaint.  A growing line of cases grapples with the States' authority to create a system of judicial elections on the one hand and regulate judicial campaign speech on the other.  *See Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656 (2015); *Republican Party of Minn. v. White*, 536 U.S. 765 (2002); *Carey v. Wolnitzek*, 614 F.3d 189 (6th Cir. 2010).  At issue today are several clauses in Kentucky's judicial canons—from prohibitions on "campaign[ing] as a member of a political organization," to "endors[ing] . . . a candidate for public office," to "mak[ing] a contribution to a political organization," to making any "commitments" with respect to "cases, controversies, or issues" likely to come before the court, to making "false" or "misleading" statements.  The district court issued a thorough and thoughtful opinion, making our job easier.  It struck some of these provisions and upheld others.  We agree with almost all of its reasoning and affirm almost all of its judgment.

I.

Robert Winter's campaign literature identified him as a "lifelong Republican" and informed voters that his opponents were registered Democrats.  R. 29-1 at 2.  The Judicial Conduct Commission, which enforces the Code, sent him a "probable cause" letter, stating that his mailers may have violated the canon prohibiting "campaign[ing] as a member of a political organization."  Rules of Supreme Court of Kentucky 4.300, Canon 5(A)(1)(a); *id.* at 4.170(1) (pre-2016 version); *see* R. 1-9 at 1.

Incumbent Allison Jones asked voters to "re-elect" her, even though she was initially appointed to her seat, and she promised to "work with the legislative and executive branches to

ensure that the law provides stiff penalties for heroin dealers and that the judiciary has the tools necessary to reduce recidivism among heroin addicts that are arrested and sentenced." R. 80 at 4, 8. Her "re-elect" statement, the Commission wrote in its probable cause letter, potentially violated the canon prohibiting "false and misleading statements." Canon 5(B)(1)(c). And her "stiff penalties" comment potentially constituted an impermissible "commitment" on an issue likely to come before her court. Canon 5(B)(1)(c).

Cameron Blau, an aspiring judge, wants to give speeches supporting the Republican Party, to hold Republican fundraisers, to seek and receive endorsements from Republican candidates, and to donate to candidates and to the party. The Code bans all of that, which left Blau "fear[ful] [to] engag[e]" in any of it due to the risk of public reprimand, disbarment from the practice of law, or eventual suspension without pay and removal from office. R. 50 at 6; *see* Rules of Supreme Court of Kentucky 4.020(1)(b).

Winter filed this lawsuit, after which Jones and Blau intervened, all three to the end of stopping the Commission (in truth, its members) from enforcing these canons against them. Both sides moved for summary judgment. Before ruling on the motions, the district court certified questions about the meaning of three of the canons to the Kentucky Supreme Court. The Court answered in February 2016. *Winter v. Wolnitzek*, 482 S.W.3d 768 (Ky. 2016). The district court issued a 45-page opinion granting in part the plaintiffs' request to enjoin the challenged canons and issuing a final judgment to that effect. Each side appealed and each side sought expedited resolution of the case.

II.

Is there an Article III case or controversy? Yes, as a general matter. All three plaintiffs plan to run in the next elections for which they are eligible, either 2016 or 2018. *See Carey*, 614 F.3d at 197. All three intend to engage in speech arguably proscribed by the canons. And the Commission plans to enforce the canons against them.

Even so, the Commonwealth contests Jones' standing on the ground that she lacks a credible threat of enforcement for her "stiff penalties for heroin dealers" comment. The question is whether Jones faces a "credible threat of enforcement" for engaging in that speech. *Susan B.*

*Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342, 2346 (2014).  The answer turns on whether the Commission's letter carried with it a valid threat of enforcement.  It did.  The letter informed her that "a complaint ha[d] been filed against [her]" and requested that she respond to the allegations in writing.  R. 72-2 at 7.  The Commission issued the letter only after deciding "there is probable cause for action."  Rules of Supreme Court of Kentucky 4.170(1) (pre-2016 version).  A state agency's probable cause finding provides a sufficient threat of enforcement to confer First Amendment preenforcement standing.  *See, e.g.*, *Driehaus*, 134 S. Ct. at 2345; *Platt v. Bd. of Comm'rs on Grievances & Discipline*, 769 F.3d 447, 452 (6th Cir. 2014).

The State would have us hold that Jones' as-applied challenge is not ripe, even though her facial challenge is ripe.  But if there is any difference between the standing requirements for as-applied and facial challenges, it is because raising a narrow as-applied challenge is easier, not harder, than raising a facial challenge.  Nor can there be standing without ripeness in preenforcement challenges.  The line between Article III standing and ripeness in preenforcement First Amendment challenges has evaporated.  *Driehaus*, 134 S. Ct. at 2346–47.  "The doctrines of standing and ripeness 'originate' from the same Article III limitation" and thus are analyzed together in challenges of this sort.  *Id.* at 2341 n.5; *see, e.g.*, *Platt*, 769 F.3d at 451; *Kiser v. Reitz*, 765 F.3d 601, 606–07 (6th Cir. 2014).  Whether the plaintiffs have standing and whether their claims are ripe come to the same question:  Have they established a credible threat of enforcement?  The answer is yes.  And the answer does not differ in this instance for as-applied and facial challenges.

Nor do any practical obstacles keep us from considering the plaintiffs' as-applied challenges.  The parties have described their conduct with plenty of detail.  The Kentucky Supreme Court has told us that the canons proscribe their speech.  And the Commission has said that it plans to enforce the canons against the plaintiffs.  That means the plaintiffs have "laid the foundation" for their as-applied challenges, *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 475–76 (7th Cir. 2012), permitting us to decide them now, *see, e.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 12, 15 (2010); *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1049–50 (6th Cir. 2015).

If the plaintiffs have standing to raise these challenges and if they are ripe for resolution, the Commission maintains, that must be because the Commission has initiated formal proceedings against them. And if that is true, it adds, *Younger* abstention bars us from hearing the case. *Younger v. Harris*, 401 U.S. 37 (1971). But a finding of probable cause does not necessarily mean a formal proceeding exists. In the absence of an ongoing enforcement action, *Younger* has no role to play, leaving us with authority, indeed an obligation, to resolve the case. *See Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 590–91 (2013).

III.

The Kentucky Constitution gives the citizens of the Commonwealth the right to vote for their judges in nonpartisan elections. Ky. Const. § 117. The First (and Fourteenth) Amendment to the United States Constitution gives candidates for elective office, whether executive, legislative, or judicial, freedom on the campaign trail to explain why they are the superior candidate for the job. *White*, 536 U.S. at 781–82, 787–88. Strict scrutiny as a result applies to any State's efforts to regulate the campaign speech of sitting or aspiring judges. *Williams-Yulee*, 135 S. Ct. at 1665.

The plaintiffs challenge eight features of the Commonwealth's Code of Judicial Conduct.

(1) *Campaigning clause.* "Except as permitted by law," Canon 5(A)(1)(a) says, "a judge or a candidate for election to judicial office shall not[] campaign as a member of a political organization." The Kentucky Supreme Court in its certification decision held that this clause prohibits candidates from "portray[ing] themselves, either directly or by implication, as the official nominee of a political party." *Winter*, 482 S.W.3d at 777. Interpreted that way, the district court held, the canon is vague and unconstitutionally overbroad. We agree.

The problem with this canon is that it's unclear when candidates go from permissibly affiliating with a party to illegally implying that they are the nominee of a party. On the one hand, the First Amendment establishes that a State may not prevent judicial candidates from publicly taking a stance on "matters of current public importance." *White*, 536 U.S. at 781–82 (quoting *Wood v. Georgia*, 370 U.S. 375, 395 (1962)). Saying "I am a Republican" is shorthand for just that, which means candidates have a constitutional right to portray themselves as a

member of a political party. *Carey*, 614 F.3d at 201–02. On the other hand, Kentucky has a right to prevent candidates from identifying themselves as *the* nominee of a political party for a judicial seat. That's because Kentucky runs its judicial elections on a nonpartisan basis. There is no Democratic or Republican nominee for each seat because political parties don't officially endorse Kentucky judicial candidates, and indeed the two candidates vying in a general election for the same seat could each support the same party.

In its certification decision, the Kentucky Supreme Court construed the canon to prohibit "suggesting to the voters that the candidate is *the* endorsed nominee of a political party." *Winter*, 482 S.W.3d at 776 (emphasis in original). A candidate for judicial office, it explained, may say that he is "a Republican" or "a Democrat," or "the only Republican" or "the only Democrat," because those phrases don't imply an endorsement. *Id.* Those claims merely portray a candidate as a member of a party. So far so good. But claiming to be "the Liberal Democrat" or "the Conservative Republican," it added, implies an endorsement—due to the definite article—and therefore violates the canon. *Id.* at 776–77.

This last point makes the canon, as construed by Kentucky's highest court, too vague to tightly regulate the problem and too vague to avoid scaring off permissible electoral speech. It's unclear when a candidate crosses the line from exercising his constitutional right to portray himself as a member of a political party, *Carey*, 614 F.3d at 201–02, to impermissibly implying the endorsement of that party. A few examples illustrate the uncertainty. Could a candidate truthfully claim to have "the endorsement of leaders of the Republican Party?" What if a candidate says, quite accurately, that "the Republicans support my campaign?" We are not sure whether this would violate Kentucky law, making us doubt whether judicial candidates would know either. The Kentucky Supreme Court said that claiming to be "*the* Conservative Republican" would violate the canon by implying an endorsement; it thought the use of "the" was the key, while the word "conservative" was mere "surplusage." *See Winter*, 482 S.W.3d at 776. But how about claiming to be "the moderate Republican candidate" or "the most experienced conservative Republican candidate?" After reading those phrases, some might infer an endorsement, but others might infer that there are other Republicans in the race. It's hard to know when a candidate has portrayed himself as an official nominee "by implication." *Id.* at

777. Because the canon (as interpreted by the Kentucky Supreme Court) gives judicial candidates little confidence about when they exercise their right to affiliate with a party or when they violate the law, the campaigning clause is vague and unconstitutionally overbroad. The district court rightly struck it in its entirety.

(2) *Speeches clause*. Suffering from a related problem is the infelicitously named speeches clause, which bans judicial candidates from "mak[ing] speeches for or against a political organization or candidate." Canon 5A(1)(c). A candidate has a free-speech right to say in a campaign speech that she is "a Republican," *Carey*, 614 F.3d at 202, and yet this clause by its terms bars a speech in which she says she is "for the Republican party." Because this clause does too much in one sense and too little in another, it does not narrowly address the problem at hand and thus is facially invalid.

In one sense, the speeches clause "does too little to advance the State's interest in impartiality and the avoidance of partisan influence." *Carey*, 614 F.3d at 202. Kentucky allows "a judicial candidate [to] identify himself to the public as a member of a political party" in many ways. *Winter*, 482 S.W.3d at 775–76. The candidate may tell any audience, no matter how big, that he is a Republican or a Democrat. *See* Canon 5A(1)(c), Cmt. He may give a speech for any political interest group, from the National Rifle Association to Planned Parenthood. And he may email, tweet, write, or say in an interview that he is for a political party. Banning him from giving a *speech* to the same effect creates serious under-inclusivity problems.

In another sense, the clause "suppresses too much speech to advance the government's interest." *Carey*, 614 F.3d at 201. By banning speech functionally identical to the speech permitted by *Carey*—that he supports a particular party, *id.* at 201–02—the clause suffers from debilitating over-inclusivity problems. Both problems establish a fit defect and preclude the canon from running the gauntlet of strict scrutiny.

True, other circuits have upheld speeches clauses in other States' judicial codes. But they did so while reviewing more narrowly written canons. *See Wolfson v. Concannon*, 811 F.3d 1176, 1179 n.2 (9th Cir. 2016) (en banc) (prohibiting candidates from making "speeches *on behalf of* a political organization" (emphasis added)); *Bauer v. Shepard*, 620 F.3d 704, 711 (7th

Cir. 2010) (same). The prohibitions at issue did not "prevent judicial candidates from announcing their views on disputed legal and political subjects." *Wolfson*, 811 F.3d at 1185. This one does. It is unconstitutional.

(3) *Contributions clause*. This clause prohibits judicial candidates from "mak[ing] a contribution to a political organization or candidate." Canon 5(A)(1)(d). As the plaintiffs see it, the provision suffers from a patent defect: If a candidate may declare "the party [he] support[s]," *Carey*, 614 F.3d at 201, it also must be the case that he can "put his money where his mouth is" by contributing to that party, R. 124 at 30. It is not that easy.

There is a distinction between speech-limiting regulations that limit all judges (elected or not) and those that hamstring judges in their efforts to run for election. For some time now, courts have recognized that a state "cannot have it both ways. If it wants to elect its judges, it cannot deprive its citizens of a full and robust election debate." *Geary v. Renne*, 911 F.2d 280, 294 (9th Cir. 1990) (en banc) (Reinhardt, J., concurring), *vacated on other grounds*, 501 U.S. 312 (1991). Kentucky, like any State, is free to staff its judiciary with elected judges. But as Justice Scalia pointed out in *White*, "the First Amendment does not permit it to achieve its goal by leaving the principle of elections in place while preventing candidates from discussing what the elections are about." 536 U.S. at 788. The campaigning and speeches clauses, invalidated above, restrict what judicial candidates may say in their own campaigns and thus violate the First Amendment. The lesson is straightforward: A State may not hold judicial elections, then prevent candidates from explaining what makes them qualified for that office.

But there is no having-it-both-ways problem with a contributions limit like this one. A contribution to a political organization or a candidate in a different campaign "is less a judge's communication about his qualifications and beliefs than an effort to affect a separate political campaign, or even more problematically, assume a role as political powerbroker." *Siefert v. Alexander*, 608 F.3d 974, 984 (7th Cir. 2010). While "[j]udicial candidates have a First Amendment right to speak in support of their campaigns," *Williams-Yulee*, 135 S. Ct. at 1673, they do not have an unlimited right to contribute money to someone else's campaign. Otherwise, the Code of Conduct for United States Judges—which bans judges from "mak[ing] a contribution to a political organization or candidate," *see* Canon 5(A)(3)—is unconstitutional.

That would come as a surprise. The "distance between" a contribution to someone else's campaign "and speech about a judge's own campaign justifies a more deferential approach to government prohibition" of contributions. *Siefert*, 608 F.3d at 984.

Financial contributions, we realize, amount to speech. *See Buckley v. Valeo*, 424 U.S. 1, 17–18 (1976). But the alignment between speech and money makes a difference only with respect to Janus-faced regulations that tell judicial candidates to run for office but deny them the tools for doing so. That is not what this regulation does. A contribution of time, money, or reputation to a political organization or a candidate in a separate election, whether judicial or not, differs in kind and degree from a judicial candidate contributing the same to his own campaign. There is "a dividing line between" the speeches clause, "which impermissibly bars protected speech about the judge's own campaign," and the contributions clause, "which addresses a judge's entry into the political arena on behalf of his partisan comrades." *Siefert*, 608 F.3d at 984. Kentucky, for this reason, allows judicial candidates to purchase tickets to political gatherings only if "he or she doesn't create the impression that the purchase is not for the advancement of the judge or candidate but is solely a contribution to another candidate or political organization, which is prohibited." Canon 5(A)(2), Cmt. The contributions clause narrowly serves the Commonwealth's compelling interest in preventing the appearance that judicial candidates are no different from other elected officials when it comes to quid pro quo politics. It is constitutional.

(4) *Endorsements clause*. The endorsements clause is of a piece. It prohibits judicial candidates from "publicly endors[ing] or oppos[ing] a candidate for public office." Canon 5(A)(1)(c). And it too has nothing to do with the push-me-pull-me problem—being forced to run for office while being denied the means of doing so—that infects most unconstitutional regulations of speech in this area. By focusing on another candidate for office, a third party other than the judicial candidate himself, this clause narrowly addresses Kentucky's compelling interest in keeping its judges above the partisan fray of trading political favors.

Endorsements differ from a candidate's own expressions of agreement with a political party's platform or another candidate's views. When a judicial candidate endorses a particular candidate, he "support[s] or aid[s]" the other candidate, rather than supporting himself, "by or as

if by signed statement." *Webster's Third New International Dictionary* 749 (3d. ed. 2002). Voters understand the difference between a speech expressing, say, the judicial candidate's progressive vision for the Commonwealth and one, say, formally endorsing the Democratic nominee for Attorney General of Kentucky or President of the United States. The former helps the candidate; the latter helps the candidates for Attorney General and President. A ban on the former "impermissibly bars protected speech about the judge's own campaign." *Siefert*, 608 F.3d at 984. But a ban on the latter permissibly "addresses a judge's entry into the political arena on behalf of his partisan comrades." *Id.*

Because endorsements often are "exchanged between political actors on a quid pro quo basis," *id.*, the endorsements clause is narrowly tailored to Kentucky's compelling interest in preventing judges from becoming (or being perceived as becoming) part of partisan political machines. As long as Kentucky "does not regulate speech with regard to any underlying issues," it may target "the act of endorsement itself, which . . . is a direct expression of bias in favor of or against potential parties to a case, or at the very least, damages the appearance of impartiality." *Wersal v. Sexton*, 674 F.3d 1010, 1026 (8th Cir. 2012). A ban on such endorsements also guards against the risk that, once a judge is elected, he will not be able to (and he will not be perceived as being able to) referee disputes involving elected officials he did or did not endorse.

The clause does not suffer from the too-much and too-little coverage problems that the speeches and contributions clauses do. The plaintiffs have not identified any protected speech banned by the endorsements clause that makes it over-inclusive. It does not prohibit speech in opposition to one's *own* opponent any more than it prohibits "endorsing" oneself. Yet it does ban the endorsement of a candidate in a different race, an act that, like the personal solicitations in *Williams-Yulee*, signals the judicial candidate's "active[] engage[ment] in political campaigns." *Wolfson*, 811 F.3d at 1184 (upholding Arizona's endorsement clause).

While the clause is narrowly drawn, it is not perfectly drawn. It has a modest under-inclusivity problem because, as the plaintiffs point out, and the Commentary to Canon 5 confirms, a judicial candidate may "privately express[] his or her views on judicial candidates or other candidates for public office." True enough. But private expressions of approval or disapproval create far fewer quid pro quo appearance problems than the candidate formally

putting his name and reputation behind another. The endorsements clause "aims squarely at the conduct most likely to undermine" non-partisanship in judicial elections and is thus narrowly tailored to that interest. *Williams-Yulee*, 135 S. Ct. at 1668.

(5) *Acting as a leader clause*. Kentucky prohibits a judge from "act[ing] as a leader or hold[ing] any office in a political organization." Canon 5(A)(1)(b). This clause does all that the First Amendment asks of it when it comes to Blau's facial challenge. The Commonwealth targets an admirable goal (preserving public confidence in its judges, *Williams-Yulee*, 135 S. Ct. at 1666) and uses permissible means in doing so ("diminishing reliance on political parties in judicial selection," *Carey*, 614 F.3d at 201). A judge who heads up a political party entrenches, rather than diminishes, political parties in judicial selection. Whether the candidate wishes to act as a leader of a political organization or hold office in a political organization, she cannot do so without directly undermining Kentucky's legitimate policy choice to hold nonpartisan elections for judges.

The difficulty comes in resolving Blau's as-applied challenge to the clause. The Kentucky Supreme Court read this clause broadly, interpreting it to include not just leading a political party or holding a formal office but also "hosting a political event." *Winter*, 482 S.W.3d at 778. And that, it turns out, is one of the things Blau wants to do. R. 50 at 5, 12–13. There are many types of political events, and it's not clear how many this canon covers.

Happily for us, Blau identifies the one he wants to host: a "fundraiser[]." Second Br. 52. And the State, it seems to us, can comfortably ban that kind of event. *Williams-Yulee* tells us the rule when it comes to fundraising for oneself. Judicial candidates do not have a constitutional right to "supplicate campaign donors." 135 S. Ct. at 1666. And fundraising for others is controlled by our reasoning on the endorsements clause. As with endorsements, fundraisers "may be exchanged between political actors on a quid pro quo basis" and are thus less about a judge's "qualifications and beliefs than [they are] an effort to affect a separate political campaign, or even more problematically, assume a role as political powerbroker." *Siefert*, 608 F.3d at 984. Both types of fundraisers bring "a judge's impartiality . . . into question" and can cause "the public [to] lose faith" in the promise of neutral and apolitical judging. *Wolfson*, 811 F.3d at 1184; *see also Bauer*, 620 F.3d at 712–13. Kentucky's ban on judges and judicial

candidates hosting political fundraisers, together with its ban on their holding a political office or leading a political party, does not impermissibly infringe Blau's free-speech rights.

(6) *False statements clause.* This clause prohibits a judge or judicial candidate from "knowingly" or "with reckless disregard for the truth" making any "false [] statements" during a campaign. Canon 5(B)(1)(c). The Kentucky Supreme Court interpreted it to prohibit "untrue utterance[s]" that are "material[]" to a campaign, and to apply to Jones' request for voters to "re-elect" her even though she was initially appointed to her post. *See Winter*, 482 S.W.3d at 776, 778–79.

The clause is constitutional on its face. The narrowest way to keep judges honest during their campaigns is to prohibit them from consciously making false statements about matters material to the campaign. This canon does that, and does it clearly. In the words of the district court: "Don't want to violate the Canon? Don't tell a lie on purpose or recklessly." R. 124 at 38. Given the mens rea requirement, a judicial candidate will necessarily be conscious of violating this canon. *Cf. Weaver v. Bonner*, 309 F.3d 1312, 1319–20 (11th Cir. 2002).

This court, it is true, recently invalidated a false-statement ban that covered all non-judicial candidates for political office in Ohio. *See Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 473–76 (6th Cir. 2016). But the Ohio law swept more broadly than Kentucky's: It applied to all false statements, not just material ones, *compare id.* at 475, *with Winter*, 482 S.W.3d at 776, and it imposed liability on publishers of false statements, not just speakers, *Susan B. Anthony List*, 814 F.3d at 475. Kentucky's narrower interest in preserving public confidence in the honesty and integrity of its judiciary also is more compelling than Ohio's purported interest in protecting voters in other elected races from misinformation. *See id.* at 475. However much or however little truth-bending the public has come to expect from candidates for political jobs, "[j]udges are not politicians," and a "State's decision to elect its judiciary does not compel it to treat judicial candidates like campaigners for political office." *Williams-Yulee*, 135 S. Ct. at 1662. Kentucky has a "vital state interest" in safeguarding the public's confidence in the honesty of its judiciary, *see id.* at 1666 (quoting *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 889 (2009)), and the State's ban on materially false statements by judicial candidates survives strict scrutiny—at least facially.

As applied to Jones, however, the State's ban does not.  The headwater of this problem is the Kentucky Supreme Court's ruling that Jones' "re-elect" statement qualified as a "materially false statement . . . calculated to mislead and deceive the voters."  *Winter*, 482 S.W.3d at 779.  Yes, "re-elect" *could* mean what the court thought it meant:  elect someone to the same position to which she was previously elected.  *See id.*  And that was not true for Jones.  The Governor had appointed her to the position; she had not been elected to it.  But the term fairly could also mean "to elect for another term in office," precisely what Jones was seeking.  *Webster's Third New International Dictionary* 1907.  Applied to a statement such as "re-elect," readily capable of a true interpretation here, the ban outstrips the Commonwealth's interest in ensuring candidates don't tell knowing lies and thus fails to give candidates the "breathing space" necessary to free debate.  *Brown v. Hartlage*, 456 U.S. 45, 60–61 (1982); *see Weaver*, 309 F.3d at 1319–20.

(7) *Misleading statements clause*.  Canon 5(B)(1)(c)'s ban on misleading statements fails across the board.  If "misleading" adds anything to "false," it is to include statements that, while technically true or ambiguous, create false implications or give rise to false inferences.  But only a ban on conscious falsehoods satisfies strict scrutiny.  *See Weaver*, 309 F.3d at 1319.  "[E]rroneous statement is inevitable in free debate," and "[t]he chilling effect of . . . absolute accountability for factual misstatements in the course of political debate is incompatible with [an] atmosphere of free discussion."  *Brown*, 456 U.S. at 60–61 (quotation omitted).  "Negligent misstatements," in contrast to knowing misstatements, "must be protected in order to give protected speech the 'breathing space' it requires," even in judicial elections.  *Weaver*, 309 F.3d at 1320.  Unknowing lies do not undermine the integrity of the judiciary in the same way that knowing lies do, and the ability of an opponent to correct a misstatement "more than offsets the danger of a misinformed electorate."  *Id.*  This clause adds little to the permissible ban on false statements, and what it adds cannot be squared with the First Amendment.

(8) *Commits clause*.    Judicial candidates may not, "in connection with cases, controversies, or issues that are likely to come before the court, make pledges, promises or commitments that are inconsistent with the impartial performance of the adjudicative duties of judicial office."  Canon 5(B)(1)(c).  We have seen a version of this canon before, and Kentucky

has (commendably) tried to focus its coverage since the last visit.  *See Carey*, 614 F.3d at 207–09.

Then and now, no one questions that Kentucky may prohibit judges from making commitments to decide specific cases in a certain way.  "The First Amendment," after all, "permits a State to limit speech when the Due Process Clause demands nothing less."  *Id.* at 207. Then and now, however, the canon does more than that by forbidding a judge from making "a promise with respect to 'issues' as well."  R. 124 at 35.  "At the broadest level of meaning," we noted in *Carey*, the clause "would seem to cover issue-related promises" on a number of impermissible bases:  promises to, say, follow stare decisis, adhere to the rule of law, or interpret the law as a textualist.  614 F.3d at 208.  But "[i]n a narrower sense," we went on, the clause might be permissibly tailored to cover commitments "exhibit[ing] a bias against parties," which would narrowly advance a compelling interest under *White*.  *Id.*  Unable to tell which thing the canon did, yet unwilling to encroach on a "co-equal sovereign," we remanded to "give the Commonwealth a first shot" at focusing the clause on its compelling interest in maintaining the impartiality—as to parties—of its judiciary.  *Id.* at 209.

Kentucky has tried to do that.  It narrowed the commits clause to cover only a commitment "that [is] inconsistent with the impartial performance of the adjudicative duties of judicial office."  Canon 5(B)(1)(c).  That language, missing from the version we reviewed in *Carey*, does much to fix the clause's "serious level-of-generality problem."  614 F.3d at 208.  A commitment on many of the issues we worried about—on stare decisis, on the rule of law, on textualism, and so on—is not inconsistent with the "impartial performance" of a judge and thus is not prohibited by the clause.  The revised commentary says as much.  "[S]tatements or announcements of personal views on legal, political, or other issues," it provides, "are not prohibited."  Canon 5(B)(1)(c), Cmt.  And the Seventh Circuit, reviewing a canon with identical language, agreed that the revised version "differ[s] considerably from the rule at issue in *Carey*," where "*all* commitments on [all] 'issues'" were prohibited.  *Bauer*, 620 F.3d at 716; *cf. Kans. Judicial Review v. Stout*, 562 F.3d 1240, 1246–47 (10th Cir. 2009).

What appears to narrow the clause, the plaintiffs respond, makes it unconstitutionally vague.  It is impossible to know, they contend, what is (and what is not) an issue-based

commitment that is "inconsistent with the impartial performance of the adjudicative duties of judicial office."

There is something to the point, and we can understand why the district court agreed with it.  While the "root meaning" of the word "impartiality" is avoiding "bias for or against either *party* to the proceeding," *White*, 536 U.S. at 775, "[n]either the commits clauses nor the [Canon's] definitions pin th[at] meaning down," *Bauer*, 620 F.3d at 716.  And while we might read this clause narrowly to toe the constitutional line, it's not clear that this would respect the Commission and state judiciary's approach to the language.  *See id.*  We doubt, for example, that Jones' promise to "continue to work with the legislative and executive branches to ensure that the law provides stiff penalties for heroin dealers," R. 80 at 8 (quotation omitted), is "inconsistent with [] impartiality" and thus anticipate that it could not be constitutionally proscribed.  But we don't know if that's how the Commonwealth will construe the provision.  Our inability to know how much protected speech the canon sweeps in means we could hold, as the district court did, that the clause is vague and unconstitutionally overbroad.

But again, "discretion, to say nothing of respect for a co-equal sovereign, is the better part of valor."  *Carey*, 614 F.3d at 209.  If Kentucky interprets "impartiality" to mean solely "impartiality as to parties," the clause may well advance a compelling interest and do so narrowly.  *See White*, 536 U.S. at 775–77.  Just as we did in *Carey*, we think it wise to "remand this aspect of the case to the district court," which will allow the defendants to "obtain authority to remove the 'issues' language"; to adopt "an acceptable narrowing construction of the 'issues' language along with a modification to the commentary"; or to "suggest certification to the Kentucky Supreme Court."  614 F.3d at 209.  For now, we will "assume that [Kentucky] will act sensibly and resolve the open questions in a way that honors candidates' rights under the first amendment" rather than "deem the law vague by identifying situations in which state officials *might* take an untenably broad reading of the commits clause[]."  *Bauer*, 620 F.3d at 716.  We thus reinstate this clause and will "wait and see" if the Commonwealth's "process [] yields greater certainty"—and firmer constitutionality.  *Id.* at 716–17.  For the last time, one hopes.

\* \* \*

Regulating campaign speech is not easy.  It's not supposed to be.  But treating elections for the courts just like elections for the political branches does not make sense either.  Candidates for judicial office, if elected, are supposed to follow the rule of law—no matter current public opinion, no matter the views of the political branches, no matter the views of the parties that support them.  But candidates for the other offices are permitted to, indeed often expected to, listen to the views of their constituents and parties.  Navigating these cross-currents is no simple task—and for that we have considerable sympathy for the efforts of the Commission.  At the same time Kentucky has the right to elect its judges on a nonpartisan basis, however, it has no right to suspend the First Amendment in the process.  If the Commission wishes to impose mandatory sanctions on the speech of judicial candidates for office, as opposed to non-enforceable guidelines or best practices, it must satisfy the rigors of the First Amendment in doing so.

IV.

We affirm the district court's judgment as to the campaigning, speeches, endorsements, acting as a leader, and misleading statements clauses, and as to the facial challenge to the false statements clause.  We reverse the court's judgment on the contributions clause and the as-applied challenge to the false statements clause.  And we vacate the court's judgment on the commits clause and remand for further consideration of that clause's meaning and validity.