RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0233p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

JOSEPH FISCHER; FISCHER FOR SUPREME COURT COMMITTEE; ROBERT A. WINTER, JR.,

> *Plaintiffs-Appellants,*

*v.*

No. 22-5938

HONORABLE KAREN A. THOMAS, as Member, Judicial Conduct Commission, HONORABLE R. MICHAEL SULLIVAN, as Member, Judicial Conduct Commission, HONORABLE EDDY COLEMAN, as Member, Judicial Conduct Commission, JEFF S. TAYLOR, as Member, Judicial Conduct Commission, HONORABLE JOE E. ELLIS, as Member, Judicial Conduct Commission, HONORABLE JANET LIVELY MCCAULEY, as Member, Judicial Conduct Commission, JIMMY SHAFFER, as Executive Secretary, Judicial Conduct Commission,

> *Defendants-Appellees.*

Appeal from the United States District Court for the Eastern District of Kentucky at Covington.
No. 2:22-cv-00121—Karen K. Caldwell, District Judge.

Decided and Filed:  October 28, 2022

Before:  GRIFFIN, THAPAR, and MURPHY, Circuit Judges.

_____

## COUNSEL

**ON EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL and REPLY:** Christopher Wiest, CHRIS WIEST, ATTY AT LAW, PLLC, Crestview Hills, Kentucky, Thomas B. Bruns, BRUNS, CONNELL, VOLLMAR & ARMSTRONG, LLC, Cincinnati, Ohio, Zach Gottesman, ZACH GOTTESMAN LAW, Cincinnati, Ohio, for Appellants. **ON RESPONSE:**  Jeffrey C. Mando, Olivia F. Amlung, ADAMS LAW, PLLC, Covington, Kentucky, for Appellees.

The court issued a PER CURIAM order.  GRIFFIN, J. (pp. 14–16), delivered a separate dissenting opinion.

---

**ORDER**

---

PER CURIAM.  The Kentucky Judicial Conduct Commission received complaints that two judicial candidates were engaging in campaign speech that violated the Code of Judicial Conduct.  The Commission responded by initiating an investigation.  The candidates sued, seeking injunctive relief under the First Amendment.  The district court denied preliminary relief ahead of the pending election on the ground that the candidates lacked standing to sue.  Because the candidates have shown a likelihood of success on the merits, we grant an injunction pending appeal.

I.

On September 27, 2022, the Kentucky Judicial Conduct Commission ("the Commission") sent letters to Joseph Fischer and Robert Winter.  Fischer is running for the Kentucky Supreme Court and Winter for the Court of Appeals.

The Commission's letters advised that unidentified (but apparently known) individuals had filed complaints against the candidates concerning their ongoing campaigns for judicial office.  Two complaints against Fischer alleged that he had "engaged in political or campaign activity inconsistent with the independence, integrity, or impartiality of the judiciary, including publicly identifying [himself] as the nominee of the Republican Party and seeking, accepting, and using endorsements from the Republican Party."  R. 13-1, Pg. ID 118.  These complaints added that Fischer had "made pledges, promises or commitments in connection with cases, controversies, or issues likely to come before the Court—specifically the issue of abortion."  *Id.*  According to the Commission, an individual filed a complaint against Winter that made similar allegations.  R. 13-3, Pg. ID 123.  After "consideration and discussion" of the complaints against Fischer and Winter, the Commission "request[ed]" that the two candidates respond to the allegations in writing by October 24.  *Id.*; R. 13-1, Pg. ID 118.  In addition, the Commission instructed its executive secretary to "invite" the candidates to attend an "informal conference" "to discuss the allegations in greater detail."  R. 13-1, Pg. ID 118; R. 13-3, Pg. ID 123.  This

"informal conference" is scheduled to take place on October 28.  The letters further instructed that, if the candidates planned to have counsel represent them, they should "have counsel file a written entry of appearance prior to the conference."  R. 13-1, Pg. ID 119; R. 13-3, Pg. ID 124.

Through counsel, Fischer and Winter filed written responses within two weeks of receiving the Commission's letters.  Emphasizing that those letters were vague about the speech at issue, the candidates requested additional information about the allegations.  R. 13-2, Pg. ID 120; R. 13-4, Pg. ID 125.  Based on the Commission's letters, Fischer and Winter also identified statements that might have prompted the complaints and explained why the First Amendment protected the statements.

At around the same time, the candidates sued for declaratory and injunctive relief in the district court.  They raised facial and as-applied challenges to Rules 4.1(A)(6), 4.1(A)(7), and 4.1(A)(13) of the Kentucky Code of Judicial Conduct (the Rules apparently invoked in the Commission's letters).  After Fischer filed (and Winter joined) a preliminary-injunction motion, the district court ordered supplemental briefing on the question whether the candidates had standing.  *See* R. 3 (motion for preliminary injunction); R. 14 (joinder); R. 15 (minute entry).  The parties completed that briefing on October 12.  On October 24, the district court still had not issued a decision.  With the Commission's informal conference looming, the candidates sought an emergency injunction pending appeal, justifying their request based on "the passage of 12 days without a ruling in the middle of an election cycle," the "specter of impending enforcement . . . [causing] self-censorship," and "the impending meeting of the Judicial Conduct Commission."  R. 19, Pg. ID 185–86.  That same day, the district court denied the request for a preliminary injunction on standing grounds.  The candidates filed an immediate appeal under 28 U.S.C. § 1292(a)(1), and they now seek an emergency injunction pending that appeal.  *See* Fed. R. App. P. 8(a)(2).

II.

This appeal turns on whether the candidates have standing and have demonstrated a likely constitutional violation.  Before issuing an injunction pending appeal, we usually consider four factors.  *Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't*, 984 F.3d 477, 479

(6th Cir. 2020) (order). But in First Amendment cases, only one question generally matters to the outcome: Have the plaintiffs shown a likelihood of success on the merits of their First Amendment claim? *See id.* at 482; *see also Bays v. City of Fairborn*, 668 F.3d 814, 819 (6th Cir. 2012).

A.

To establish a likelihood of success in a lawsuit, a plaintiff must, of course, have standing to bring it. *See Vitolo v. Guzman*, 999 F.3d 353, 359 (6th Cir. 2021). The candidates can show that they have standing to raise this pre-enforcement First Amendment challenge by establishing that: (1) they intend to engage in expression that the Free Speech Clause arguably protects, (2) their expression is arguably proscribed by the challenged Rules of the Kentucky Code of Judicial Conduct, and (3) they face a credible threat of enforcement from those Rules. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)); *id.* at 162 (quoting *Babbitt*, 442 U.S. at 298). The Commission doesn't dispute that the candidates intend to engage in speech arguably protected by the First Amendment, or that the challenged Rules arguably proscribe this speech. The Commission argues only that Fischer and Winter have failed to show a credible threat of enforcement of the Rules against them.

To identify a credible threat of enforcement, the first and most important factor is whether the challenged action chills speech. *McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016). The Commission's actions do just that. The candidates are self-censoring because the vague threats from the Commission could apply to a wide range of campaign-related speech. Beyond chill, a variety of facts can demonstrate a credible threat of enforcement. Our cases have highlighted four commonly recurring factors to consider: (1) Does the relevant prosecuting entity have a prior history of enforcing the challenged provision against the plaintiffs or others? (2) Has that entity sent warning letters to the plaintiffs regarding their conduct? (3) Does the challenged regulatory regime make enforcement easier or more likely? and (4) Did the prosecuting entity refuse to disavow enforcement of the challenged provision against the plaintiffs? *See Online Merchants Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021) (recounting factors articulated in *McKay*, 823 F.3d at 869). This isn't a laundry list; the candidates don't have to satisfy all the factors. Yet all four weigh in the candidates' favor.

First, the Commission investigated Winter for similar conduct during his 2014 campaign. *See Winter v. Wolnitzek,* 834 F.3d 681, 686 (6th Cir. 2016). Fischer, by contrast, is a first-time judicial candidate, so there's no history of enforcement against him. But the fact that Fischer is a first-time candidate does not give the Commission one free bite. That is one reason we allow candidates to meet this factor by pointing to past enforcement against others. *See Driehaus*, 573 U.S. at 159 ("companion's prosecution showed that [petitioner's] concern with arrest was not chimerical" (internal quotation marks omitted)). Here, the past actions against Winter suffice.

Second, the Commission's letters to the candidates warned that it had launched a preliminary investigation into their conduct. This court has recognized that similar warnings suffice to support the second factor. In *Online Merchants*, for example, the Kentucky Attorney General sent a letter informing a company that he was opening an investigation into the company's activities. 995 F.3d at 546. The Attorney General also sent a subpoena and a civil investigative demand stating that he had "reason to believe" the company was violating Kentucky law. *Id.* We held that these materials supported the second factor because they showed that the Attorney General had "reason to believe" that a state-law violation had occurred or would occur. *Id.* at 550. And we reached that conclusion despite noting the materials "stop[ped] short of finding a violation ha[d] occurred." *Id.* at 551.

The same logic applies here. The Commission only sends notification letters after determining that "there is a basis for investigation of a matter within the jurisdiction of the Commission." SCR 4.170(1). And the Commission freely admits this is no routine matter. Indeed, in approximately 92% of cases, the Commission disposes of the complaint without ever notifying the judge or candidate. *See* R. 17-1, Pg. ID 158–59.

Discounting this factor, the district court believed the Commission needed to make a formal "probable cause" finding. Not so. *Winter* identified a probable-cause determination as a *sufficient* condition to support a plaintiff's standing—not a *necessary* one. *See* 834 F.3d at 687. To avoid triggering *Winter* again, the Commission removed the probable-cause determination. *See* SCR 4.170(1). But this removal hasn't made the warning letters toothless. Indeed, as noted above, the Commission sends out warning letters only in the rare case in which it believes that it has a "basis" to investigate. And the Commission cannot eliminate a judicial

candidate's standing to challenge its regulation of the candidate's speech merely by changing the label from a "probable cause" requirement to a "basis for investigation" requirement. Rather, what matters for this second factor is whether plaintiffs have pointed to "enforcement warning letters" addressing "their specific conduct." *McKay*, 823 F.3d at 869. Here, the candidates have done so.

Third, the Code contains a feature making enforcement "easier or more likely"—namely, a provision authorizing any member of the public to file complaints. *McKay*, 823 F.3d at 869. Here, "the universe of potential complainants is not restricted to state officials who are constrained by explicit guidelines or ethical obligations." *Driehaus*, 573 U.S. at 164. Rather, the Commission permits "[a]ny individual with knowledge of possible judicial misconduct or wrongdoing" to file a complaint. *See* Judicial Conduct Commission Flyer at 2, https://bit.ly/3U2gUNI. And that includes "political opponents" with incentives to file "frivolous complaints" on the eve of an election. *Driehaus*, 573 U.S. at 164. In fact, given how easy it is to file a complaint, the elimination of the probable-cause requirement actually strengthens the candidates' case. Because the revised Code (allegedly) lessened the standard the Commission uses in deciding whether to notify and investigate candidates, the citizen-enforcement provision has *more* teeth.

Fourth, the Commission has refused to disavow enforcement of the challenged Code of Judicial Conduct provisions. *See McKay*, 823 F.3d at 869. Both in the district court and here, the Commission has stated that it "will not, at this time, definitively disavow enforcement of the Code against [the candidates]." Appellees' Response at 15. But our caselaw makes it clear that such refusals, in combination with the other factors, weigh in favor of finding a credible threat of prosecution. *See McKay*, 823 at 869; *see also Platt v. Bd. of Comm'rs on Grievances & Discipline*, 769 F.3d 447, 452 (6th Cir. 2014).

Therefore, all four factors support that there is a credible threat of enforcement.

One final point. Because the Commission's threats have begun to materialize, this case may be even easier than the typical threat-of-enforcement case. Apart from the risk of formal enforcement proceedings in the *future*, Fischer and Winter are incurring injuries in the *present* by

having to respond to the Commission's ongoing investigation.  They have already hired counsel to write responses to the Commission's letters.  And the Commission has asked them to attend an "informal conference" to explain themselves.  In other words, this informal investigation has "forced [them] to divert significant time and resources to hire legal counsel and respond to discovery requests in the crucial days leading up to an election." *Driehaus*, 573 U.S. at 165.

While the Commission has attempted to describe the candidates' attendance at the conference as "voluntary" (meaning not backed by a subpoena), what judicial candidates would feel like they could simply ignore this sort of governmental investigation?  As we have said in a related context, the Commission's "invitation" to attend the conference "could carry an implicit threat of consequence" should a candidate "decline the invitation." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019).  After all, the risk of the Commission opening a formal proceeding "lurks in the background of the invitation." *Id.*  Though we need not decide whether this informal investigation alone creates Article III injury, it at least confirms the existence of a credible threat of enforcement. *Cf. Driehaus*, 573 U.S. at 166.

B.

Satisfied that the candidates have standing, we turn to the merits.  Here, the Commission makes only one argument—and it is *not* on the merits.  Rather than address the candidates' First Amendment challenge now, the Commission says, we should remand for the district court to consider that challenge in the first instance. *See* Appellees' Response at 18–19.  Its argument mistakes the motion before us.  Fischer and Winter have filed a Rule 8 motion requesting an injunction pending their full appeal of the district court's order denying their requested injunction. Fed. R. App. P. 8.  It is black-letter law that, to resolve that motion (which requests a nonfinal appellate order), we must analyze the likelihood of success on the merits of the candidates' claims. *See Tiger Lily, LLC v. U.S. Dep't of Hous. and Urban Dev.*, 992 F.3d 518, 521–22 (6th Cir. 2021) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

The Commission claims that one of our unpublished orders nevertheless counsels this type of remand. *Ramsek v. Beshear*, No. 20-5542, 2020 U.S. App. LEXIS 17203 (6th Cir. May 29, 2020).  Quite the contrary. *Ramsek* did involve a Rule 8 motion, and it resolved that motion

by analyzing the likelihood of success on the merits and *granting* injunctive relief pending appeal. *See* Order, *Ramsek v. Beshear*, No. 20-5542 (6th Cir. May 23, 2020). As in *Ramsek*, we have enough to decide the emergency motion for an injunction pending appeal. And as in *Ramsek*, we leave a final appellate ruling on the district court's preliminary-injunction order for a later date.

By focusing solely on *Ramsek* and not addressing the merits at all, the Commission has forfeited any further argument about likelihood of success. *See United States v. Kerley*, 784 F.3d 327, 340 (6th Cir. 2015). But even ignoring the forfeiture, the candidates have shown a likelihood of success on the merits because, as applied to them, the challenged Code of Judicial Conduct Rules likely violate the First Amendment. *See Tiger Lily*, 992 F.3d at 522.

Start with the Commission's failure to identify the speech that triggered its investigation. That poses an obvious chilling problem: The candidates are left wondering what speech crossed the line. *See, e.g.*, R.18-2, Pg. ID 181 (in the wake of these events, Winter is "considering whether it is appropriate to pull [his] signage, which denotes that [he is] 'conservative,' all over the 6th Supreme Court District"). Forced to guess in the heat of an election, a candidate will censor much more speech than necessary. And when is a candidate in the clear? No one knows, because the Commission doesn't say.

Given the Commission's vague allegations, the candidates have guessed at which of their speech might have violated the rules. They offer several possibilities. The First Amendment protects each.

### 1. "Nominee" and "Endorsement" Rules

To begin, Fischer's letter suggests that he identified himself as the official Republican "nominee," while both Fischer's and Winter's letters claim they used the endorsement of the Republican Party. *See* R. 13-1, Pg. ID 118; R. 13-3, Pg. ID 123. Rule 4.1(A)(6) prohibits a judge or judicial candidate from "publicly identify[ing] himself or herself as a nominee of a political organization." Rule 4.1(A)(7) provides that a judge or judicial candidate shall not "seek, accept, or use endorsements from a political organization."

Here's the logo Fischer believes the Commission is concerned about:



R. 13, Pg. ID 100. Most of his campaign materials are similar. He identifies himself as "conservative" and "Republican." *Id.* So does Winter. But neither candidate ever claimed to be the Republican nominee, nor did either one use the "Republican elephant":



*Id.* Pg. ID 100 & n.4.

The statements the candidates have identified likely comport with the Constitution. As we have already held, "candidates have a constitutional right to portray themselves as a member of a political party." *Winter*, 834 F.3d at 688. And these statements and logos do no more than that.

Let's go line by line. There's no problem with the candidates identifying themselves as "conservative." Candidates may tell voters what they think about the issues of the day, including the size of government and social issues. *Carey v. Wolnitzek*, 614 F.3d 189, 201 (6th Cir. 2010) (discussing *Republican Party of Minn. v. White*, 536 U.S. 765 (2002)). Or they may use

"shorthand" to communicate "their views on many issues at once." *Id.* at 202 (emphasis omitted). So "conservative" is no problem. Nor is identifying themselves as Republican. *Winter*, 834 F.3d at 688. And since the First Amendment protects each alone, there's no problem with using them together.

Adding the definite article "the" likely doesn't change the analysis. True, Fischer's logo identifies him as "*the* conservative Republican." But simply adding "the" to "conservative Republican" does not imply that he's received the party's nomination. *See, e.g.*, *id.* at 689. Just as plausibly, the statement implies that there is *more than one* Republican in the race (rather than just one official "nominee") because it suggests that Fischer more conservative than other Republican candidates. Since claiming the mantle of the "conservative" Republican is not the same as claiming to be the party's nominee, the First Amendment likely covers this speech too.

Nor does use of the elephant imply that Fischer is the nominee. First, the elephant Fischer uses isn't even the Republican Party's elephant. So it's hard to see how the "general elephant" on his sign equals an endorsement from the Republican Party. Second, if Fischer's elephant violates Rule 4.1(A)(7), what doesn't? What if Fischer put a picture of himself riding an elephant? Or a donkey dancing with an elephant? Simply put, the First Amendment doesn't allow the Commission to ban animal symbols just because they happen to be closely associated with political parties.

Finally, the candidates worry the Commission may be concerned with the endorsements the candidates received from various Republican Party committees and elected officials. The candidates fear that unless they explicitly disavow these endorsements, they may face sanctions. Receiving an endorsement shouldn't be a problem, because a comment to Rule 4.1(A)(7) states that a "judicial candidate is not required to disavow an endorsement." *See* SCR 4.1 cmt. 10. But, of course, the Commission's letters are vague, so the candidates understandably may assume the worst.

In short, at this initial stage, the candidates have shown that the First Amendment likely protects each of the statements that they would like to continue to make.

2. Rule Against "Pledges," "Promises," Or "Commitments"

The Commission's letters also point to allegations that the candidates made "pledges, promises, or commitments" about "the issue of abortion." R. 13-1, Pg. ID 118; R. 13-3, Pg. ID 123. These statements would violate Rule 4.1(A)(13), which provides that a judicial candidate shall not "make pledges, promises, or commitments that are inconsistent with the impartial performance of the adjudicative duties of judicial office." The Code defines "impartial" as "absence of bias or prejudice in favor of, or against, particular parties or classes of parties, as well as maintenance of an open mind in considering issues that may come before a judge." SCR 4.300, Terminology.

As best we can tell from the complaint, this allegation refers to the endorsements the candidates received from various pro-life groups. There's nothing constitutionally problematic about those groups endorsing the candidates. And just as with partisan endorsements, the candidates have no obligation to disavow endorsements they receive from advocacy groups either.

Of course, both candidates admit they have been involved with pro-life organizations and legislation in the past. But judges do not join the bench as blank slates. One would be hard-pressed to find a lawyer who lacks strong views about one issue or another. And as the Supreme Court has recognized, "it is virtually impossible to find a judge who does not have preconceptions about the law." *White*, 536 U.S. at 777.

But how can the candidates be open-minded when they've taken a stance on such a contentious issue? Fischer answered this very question in a Facebook post:

> If a judge holds a personal moral objection to murder, does that moral objection disqualify the judge from deciding a capital murder case? If the same judge has a personal moral objection to the death penalty, does that objection likewise disqualify the judge? Unless the judge had a personal bias against one of the parties to the case, those sincerely held moral beliefs would not create a legal impediment to the judge applying the facts of the case to the text of the law and imposing the appropriate punishment. The hallmark of impartiality and the rule of law is the judge's commitment to put aside their personal opinions about political issues and decide each individual case based on the law as written.

R. 13, Pg. ID 103. The post provides an eloquent defense of why endorsements and affiliations do not impact future rulings. And surely this post itself is both campaign speech and constitutionally protected.

Moreover, these endorsements do not violate the Endorsements Rule because the pro-life groups are not political organizations as defined in the Code of Conduct. The Code defines "political organization" as "a political party or other group sponsored by or affiliated with a political party or candidate, the principal purpose of which is to further the election or appointment of candidates for partisan political office." SCR 4.300, Terminology. There is no evidence these groups qualify as political organizations. And banning the use of non-partisan endorsements does nothing to further Kentucky's compelling interests. *See Winter*, 834 F.3d at 692 (highlighting state's compelling interest in "non-partisanship in judicial elections"). Of course, judicial candidates may not pledge or commit to rule a specific way to get a group's endorsement. That type of conduct the Code could properly forbid.

Thus, the candidates have also likely established that the First Amendment bars the Commission from constitutionally punishing the candidates for their past activity and advocacy or for current endorsements from non-partisan groups.

Finally, the candidates worry that the Commission may also scrutinize their statements regarding judicial activism and the rule of law. We have reviewed the letters and see no such threat. And for good reason. We have already held that such statements are protected speech. *See Carey*, 614 F.3d at 208.

\* \* \*

When a judicial commission sends vague and threatening letters to candidates on the eve of election, it puts the candidates to a choice between self-censorship and uncertain sanctions. The First Amendment protects the candidates from having to make such a choice. Thus, we grant the motion for an injunction pending appeal.

The Commission is enjoined from taking any action, including initiating formal proceedings, against the candidates for:

1. The statement that Fischer is "the conservative Republican";

2. The statement that Winter is "conservative" or "Republican";

3. Fischer's use of an elephant that is not the official logo of the Republican Party;

4. Fischer's and Winter's failure to disavow endorsements that they have received from Republican Party executive committees and officials;

5. Kentucky Right to Life and Northern Kentucky Right to Life's endorsements;

6. Fischer's and Winter's use of Kentucky Right to Life and Northern Kentucky Right to Life's endorsements;

7. Fischer's and Winter's past affiliation with Kentucky Right to Life and Northern Kentucky Right to Life.

---

**DISSENT**

---

GRIFFIN, Circuit Judge, dissenting.

I respectfully dissent. Because the district court properly concluded that there is not a credible threat of prosecution at this time, I would deny plaintiffs' emergency motion for an injunction pending appeal.

Plaintiffs are candidates for judicial office in Kentucky. During their present campaigns, the Kentucky Judicial Conduct Commission received complaints against them alleging violations of the Kentucky Code of Judicial Conduct's restrictions on political activities. The Commission notified plaintiffs of the complaints and offered them the opportunity to respond, in writing or at an informal conference (presently scheduled for October 28, 2022). In response, plaintiffs filed this lawsuit, challenging the constitutionality of portions of the Code of Judicial Conduct and seeking a temporary restraining order preventing the Commission from initiating formal enforcement proceedings against them. The district court ruled that plaintiffs lacked standing and denied injunctive relief.

Article III of the Constitution limits our jurisdiction to "Cases" and "Controversies." U.S. Const., Art. III, § 2. "The doctrine of standing gives meaning to these constitutional limits by 'identifying those disputes which are appropriately resolved through the judicial process.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (brackets omitted)). To establish standing under Article III, a plaintiff must show an "injury in fact" that is fairly traceable to the challenged action of the defendant and is capable of being "redressed" by the court. *Lujan*, 504 U.S. at 560–61 (citations omitted).

Only the injury-in-fact element is relevant here. An injury sufficient to satisfy Article III must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* at 560 (citation and quotation marks omitted). "An allegation of future injury may suffice if

the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List*, 573 U.S. at 158 (internal quotation marks omitted). In the pre-enforcement context, "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Id.* (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).

The question here is whether plaintiffs have demonstrated a credible threat of prosecution. As we have stated before, "[t]he answer turns on whether the Commission's letter carried with it a valid threat of enforcement." *Winter v. Wolnitzek*, 834 F.3d 681, 687 (6th Cir. 2016). True, "[a] state agency's probable cause finding provides a sufficient threat of enforcement to confer First Amendment preenforcement standing." *Id.* (citing *Susan B. Anthony List*, 573 U.S. at 163). But the letters in the present case contain neither a probable cause finding, nor anything else indicative of a sufficient risk of enforcement like findings of fact or assessments by the Commission or warnings about continuing the complained-of activities. Rather, the letters merely announce the Commission's intent to gather additional facts and invite plaintiffs to attend informal meetings to help it do so. This invitation alone is not a credible threat of enforcement.

Absent a clear threat of enforcement, plaintiffs can establish standing by both alleging a "subjective chill" on their speech and then pointing to "some combination of the following factors: (1) a history of past enforcement against the plaintiffs or others, (2) enforcement warning letters sent to the plaintiffs regarding their specific conduct, and/or (3) an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action." *McKay v. Federspiel*, 823 F.3d 862, 868–69 (6th Cir. 2016) (citations omitted). We may also consider "a defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff." *Id.*

Plaintiffs allege a subjective chill on their speech, but none of the remaining factors are present on this record. First, plaintiffs have not presented evidence of any past formal enforcement actions. Second, as noted above, the letters at issue here do not "warn" plaintiffs about their conduct. Third, the Kentucky Code of Judicial Conduct has a public-initiation

feature.  *See* Ky. St. S. Ct. Rule 4.170(1).  That feature may "bolster[]" the credibility of an enforcement threat, *see Susan B. Anthony List*, 573 U.S. at 164, but it alone is insufficient, *McKay*, 823 F.3d at 869 (requiring a "combination" of factors); *see also Platt v. Bd. of Comm'rs on Grievances and Discipline of the Ohio Sup. Ct.*, 769 F.3d 447, 452 (6th Cir. 2014) (listing public-initiation feature as one of several facts supporting a credible threat of enforcement).  And finally, while the Commission has not disavowed enforcement against plaintiffs, the Commission is conducting a preliminary investigation, after which it may choose not to initiate formal proceedings.  This renders any threat of enforcement "less immediate" than plaintiffs contend. *See McKay*, 823 F.3d at 870.

Plaintiffs have not demonstrated that the letters sent by the Commission contain credible threats of enforcement.  Accordingly, I believe they do not presently have standing to challenge the Commission's actions.  Without standing, they are not entitled to an injunction pending appeal.  *See Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 256 n.4 (6th Cir. 2018).

For these reasons, and the reasons stated by the district court, I would deny plaintiffs' motion for an injunction pending appeal.

ENTERED BY ORDER OF THE COURT

Deborah S. Hunt, Clerk