RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0141p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

JOSEPH FISCHER; FISCHER FOR SUPREME COURT COMMITTEE; ROBERT A. WINTER, JR.,

        *Plaintiffs-Appellees/Cross-Appellants,*

    *v.*

HON. KAREN A. THOMAS, HON. R. MICHAEL SULLIVAN, HON. EDDY COLEMAN, HON. JEFF S. TAYLOR, HON. JOE E. ELLIS, and HON. JANET LIVELY MCCAULEY, as Members, Judicial Conduct Commission; JIMMY SHAFFER, as Executive Secretary, Judicial Conduct Commission,

        *Defendants-Appellants/Cross-Appellees.*

> Nos. 25-5385/5400

─────────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Covington.
No. 2:22-cv-00121—Karen K. Caldwell, District Judge.

Argued: March 18, 2026

Decided and Filed: May 12, 2026

Before: GRIFFIN, THAPAR, and MURPHY, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Casmir M. Thornberry, ADAMS LAW, PLLC, Covington, Kentucky, for the Commission Members. Christopher Wiest, CHRIS WIEST, ATTY AT LAW, PLLC, Covington, Kentucky, for the Candidates. **ON BRIEF:** Casmir M. Thornberry, Olivia F. Amlung, Jeffrey C. Mando, ADAMS LAW, PLLC, Covington, Kentucky, for the Commission Members. Christopher Wiest, CHRIS WIEST, ATTY AT LAW, PLLC, Covington, Kentucky, Thomas B. Bruns, BRUNS CONNELL VOLLMAR & ARMSTRONG, Cincinnati, Ohio, for the Candidates. Bethany A. Breetz, STITES & HARBISON, PLLC, Louisville, Kentucky, for Amicus Curiae.

    THAPAR, J., delivered the opinion of the court in which MURPHY, J., concurred and GRIFFIN, J., concurred in part. GRIFFIN, J. (pp. 17–21), delivered a separate opinion concurring in part and dissenting in part.

—————————

**OPINION**

—————————

THAPAR, Circuit Judge.   Elections have consequences.   And when a state decides to elect its judges, the state must comply with the First Amendment.   In this case, two former candidates for Kentucky judicial office argue that the state violated the First Amendment when it threatened to sanction them for their campaign speech during a 2022 election.   They're right.   So we agree the candidates are entitled to declaratory and injunctive relief.

I.

*The campaign.*   In 2022, Joseph Fischer and Robert Winter campaigned to become Kentucky state judges.   During the campaign, both candidates took steps to inform voters of their ideological views.   Fischer posted campaign signs identifying him as "the Conservative Republican" and including an outline of an elephant's head.   R. 13-2, Pg. ID 120.   Winter similarly referred to himself as a "conservative" and "a Republican."   R. 13-4, Pg. ID 125.   Both candidates also received (but neither sought nor used) endorsements from local Republican Party committees and made appearances at Republican Party events.   And they used endorsements from pro-life organizations in their campaign materials.

Because of that campaign conduct, multiple individuals filed complaints with the Kentucky Judicial Conduct Commission.   Two complaints against Fischer asserted that he had undermined the integrity of the judiciary by "publicly identifying [himself] as the nominee of the Republican Party and seeking, accepting, and using endorsements from the Republican Party."   R. 13-1, Pg. ID 118.   Those complaints also accused Fischer of making promises relating to potential future cases involving abortion.   And one complaint against Winter contained similar allegations.

*The warning letters.*   So just over a month before the election, the Commission sent the candidates warning letters about their campaign conduct.   The letters noted that multiple individuals had filed complaints against the candidates alleging unethical campaign activity and warned that those complaints were a basis for further investigation.

The Commission's letters didn't explicitly cite any rules the candidates might have violated.  But the letters did use language from specific rules.  For one, the letters apparently referenced Rule 4.1(A)(6) of the Kentucky Code of Judicial Conduct—the "Nominee Rule"— which prohibits judicial candidates from holding themselves out as the nominees of political parties.  They also all but quoted Rule 4.1(A)(7)—the "Endorsement Rule"—which prohibits judicial candidates from seeking, accepting, or using endorsements from a "political organization."   And the letters similarly touched on Rule 4.1(A)(13)—the "Commitment Rule"—which prohibits candidates from making "pledges, promises, or commitments that are inconsistent with the impartial performance of the adjudicative duties of judicial office."

The Commission requested that both candidates file written responses to the allegations and invited the candidates to an "informal conference" shortly before the election "to discuss the allegations in greater detail."  R. 13-1, Pg. ID 118; R. 13-3, Pg. ID 123.  Within two weeks of receiving the letters, Fischer and Winter filed written responses with the Commission.  The candidates objected that the Commission's allegations were vague and requested additional information about what speech the complaints referenced.  They also identified elements of their own speech—including the use of generic logos, statements about party affiliation, and receipt of endorsements—that they suspected could have triggered the complaints.

*The preliminary injunction.*  Fischer and Winter feared the Commission would take enforcement action against them, so they sued in federal court for declaratory and injunctive relief.  They argued that their speech was protected by the First Amendment, so they brought facial and as-applied challenges to Rules 4.1(A)(6), 4.1(A)(7), and 4.1(A)(13).  Fischer and Winter also sought a preliminary injunction to prevent the Commission from enforcing the rules against them while this litigation was pending.  But the district court denied their motion because it found that the candidates lacked standing.  The candidates appealed and sought an emergency injunction pending appeal.  *See* Fed. R. App. P. 8(a)(2).

We granted the candidates' motion and enjoined the Commission from bringing any enforcement actions against them for the conduct described in their response to the Commission's letters.  *See Fischer v. Thomas* (*Fischer I*), 52 F.4th 303, 313 (6th Cir. 2022) (per curiam).  We concluded the candidates had standing because there was a credible threat that the

Commission would take enforcement action against them for alleged violations of the Kentucky Code of Judicial Conduct. *Id.* at 307–09. And on the merits, the candidates were likely to establish that the First Amendment protected their challenged conduct. *Id.* at 309–13.

That injunction stayed in effect until election day. Both candidates lost their elections. Because that meant the candidates would no longer suffer any irreparable injury absent an injunction, we dissolved the injunction pending appeal and affirmed the district court's denial of a preliminary injunction. *See Fischer v. Thomas* (*Fischer II*), 78 F.4th 864, 867 (6th Cir. 2023). But each plaintiff still faced the threat of enforcement based on his past conduct, so the case wasn't moot. *Id.* at 868.

*Summary Judgment.* After another year of litigation, both sides moved for summary judgment. The district court granted summary judgment to the candidates on most of their claims. To start, the district court determined that the case wasn't moot. On the merits, the court found that the Nominee Rule and Commitment Rule were unconstitutional as applied to the speech that the candidates identified as possible enforcement targets. Next, the district court rejected the candidates' as-applied challenge to the Endorsement Rule, but agreed that the rule was unconstitutionally vague on its face. The district court therefore entered a permanent injunction against enforcement of the Nominee and Commitment Rules as applied to the candidates' speech and against enforcement of the Endorsement Rule facially. The Commission timely appealed and the candidates cross-appealed. Since these appeals present only legal questions, we review the district court's decision de novo.[1]

## II.

The Commission first argues that the candidates lack standing because it has no plans to bring enforcement proceedings based on the candidates' past speech. But before this case started, the candidates received warning letters from the Commission notifying them that the Commission had received complaints about their conduct and asking them to attend a conference to discuss the allegations. That was a serious threat. After all, the Commission admits that it

---

[1] In front of the district court, the candidates specifically explained that the conduct identified above is what "underlie[s] the free speech at issue in this matter." R. 47, Pg. ID 723–27. So the district court limited its remedy to that specific conduct. And so will we.

dismisses approximately 92% of complaints without even notifying a judicial candidate.  In that light, the Commission's very decision to send a letter suggests it had already made a threshold determination that the conduct was problematic.  So when the candidates received that warning letter, there was a credible threat that the Commission planned to take enforcement action against them.

Thus, as we concluded in *Fischer I*, the candidates had standing to bring their challenge at the beginning of the case.  *Fischer I*, 52 F.4th at 307–09.  And we haven't learned anything since *Fischer I* that would alter our previous conclusion.

The Commission responds that the candidates lack standing because, after this case began, it has disavowed enforcement by saying it doesn't presently intend to punish the candidates under the challenged rules.  But when plaintiffs have standing at the beginning of the case, subsequent factual developments concern mootness, not standing.  *Fox v. Saginaw County*, 67 F.4th 284, 295 (6th Cir. 2023).  The Commission's argument here concerns subsequent factual developments:  its own statements made after litigation started about whether it *currently* intends to take enforcement action against the candidates.  Those statements address the Commission's present intent, not whether it intended to enforce the rules against the candidates at the time the candidates sued.  So that's an argument about mootness.

This case isn't moot.  A case becomes moot when intervening events make it impossible for us to grant the complaining party any effectual relief.  *Pavia v. Nat'l Collegiate Athletic Ass'n*, 154 F.4th 407, 412 (6th Cir. 2025).  The candidates here remain under investigation for their conduct during the 2022 campaign.  And the Commission hasn't dismissed the complaints against either Fischer or Winter.  Indeed, as the Commission admitted at argument, it hasn't dismissed the complaints against Fischer and Winter because it may want to "look behind the curtain" for violations.  Oral Arg. at 07:50–07:53.  Thus, by its own admission, the Commission retains jurisdiction to punish the candidates for their speech in the 2022 campaign.  Ky. Sup. Ct. R. 4.025(1), (2).  That means we can grant the candidates an injunction preventing the Commission from sanctioning them for that past conduct.

The Commission's attempt to disavow enforcement against the candidates' speech doesn't change that. That's because defendants generally can't moot a case by voluntarily ceasing their challenged practice. *See Pavia*, 154 F.4th at 414. Otherwise, they could simply restart the practice once the case is dismissed. So when that kind of "voluntary cessation" occurs, a case is moot only if it's "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quotation omitted). That high bar isn't met here.

The Commission contends that testimony from its executive secretary, Jimmy Shaffer, shows that enforcement won't occur. In a 2024 deposition, Shaffer testified that she was "not saying any one" of the candidates' activities violated the Code of Judicial Conduct. R. 41, Pg. ID 363. She further specified that she was "not making a determination about each individual thing." *Id.* And she conceded that using endorsements from certain Kentucky pro-life groups wouldn't have been a problem "without more." *Id.* at 399. Yet at the same time, she noted that all the activities "together" could have "warranted further investigation." *Id.* at 363. And with respect to the Endorsement Rule, she believed that "it at least raised a question" as to whether the candidates' conduct violated the Code. *Id.* at 371. The Commission argues that these statements show the candidates no longer face any threat of enforcement.

But none of this testimony makes it "absolutely clear" that the Commission won't take enforcement action against the candidates. *Laidlaw*, 528 U.S. at 189 (quotation omitted). For starters, Shaffer made these comments during litigation two years after the Commission sent the warning letters. That time lapse means her comments are less persuasive evidence of whether the Commission will bring enforcement actions. After all, at that point, Shaffer had an incentive to claim there would be no enforcement. *See Tennessee v. Dep't of Educ.*, 104 F.4th 577, 589 n.8 (6th Cir. 2024). And even though Shaffer's statements suggest that enforcement may be unlikely or that she believes the candidates haven't committed a clear-cut violation, she didn't explicitly disavow enforcement against the candidates. Nor did the Commission make such a disavowal in its summary-judgment briefing before the district court or in its appellate briefing. What's more, even though Shaffer was designated to speak for the Commission, her statements

don't necessarily bind the Commission. That's because the Commission itself is a multi-member body that makes its own decisions independently of Shaffer's assessments of complaints.

Finally, a defendant's voluntary cessation may also moot a case when "practical realities" would prevent enforcement in the future. *Pavia*, 154 F.4th at 414. But the Commission hasn't identified any circumstances on the ground that would stop them from enforcing the rules against the candidates. So without an injunction in place, the Commission would ultimately be "free to return to its old ways" and continue investigating the candidates. *Id.* That means enjoining enforcement of the challenged rules would still give the candidates effectual relief, and this case isn't moot.

III.

Turning to the merits, the candidates bring as-applied challenges to the Nominee Rule, the Endorsement Rule, and the Commitment Rule. But as the Commission points out, these rules might not even cover the candidates' speech. That raises a threshold question: What's the correct order of operations for resolving an as-applied challenge? *Christian Healthcare Ctrs., Inc. v. Nessel*, 117 F.4th 826, 859 (6th Cir. 2024) (Murphy, J., concurring). In other words, should a court decide if a law even covers the conduct at issue *before* asking whether applying that law would violate the Constitution?

Principles of constitutional avoidance indicate that a court should dispose of a challenge by interpreting a state law rather than reaching a constitutional question. *See id.* So in a case like this, a court should hesitate to address the rules' constitutionality without first deciding whether the rules cover the challengers' conduct. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988). If a court determines the rules don't cover the challengers' conduct, it would face a few options to resolve the case: (1) grant an injunction, (2) issue a declaratory judgment, or (3) dismiss the as-applied challenge. But the Commission hasn't asked us for these forms of relief here. And even if it had, granting any of those remedies raises its own problems.

First, a court could issue an injunction stopping the state officials from enforcing the state statute against the challenger. Yet that likely runs afoul of the doctrine of state sovereign

immunity, which prohibits federal courts from ordering state officials to follow state law. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).

That's not to say that sovereign immunity would always bar such an injunction. For example, the state could waive sovereign immunity and consent to suit. *See Henry v. Metro. Sewer Dist.*, 922 F.2d 332, 337 (6th Cir. 1990). Likewise, if a state fails to assert sovereign immunity, a court doesn't need to raise that defense on its own and can ignore sovereign immunity. *Wisc. Dep't of Corr. v. Schacht*, 524 U.S. 381, 390 (1998); *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 613–14 (6th Cir. 2020) (per curiam).

But when a challenger brings an as-applied challenge, the state isn't necessarily on notice that its sovereign immunity will be implicated. Why? Because when a plaintiff brings a prospective constitutional challenge to a state law, the state wouldn't have a sovereign-immunity defense to those federal constitutional claims. *See Ex parte Young*, 209 U.S. 123, 154–60 (1908). So the state wouldn't see any reason to raise sovereign immunity. And even if the state argues the law doesn't cover the challenger's conduct, it wouldn't expect the court to issue a remedy based on state law, which would ordinarily be barred under *Penhurst* by the state's sovereign immunity. So once again, the state wouldn't have anticipated the need to raise sovereign immunity. In short, the state wouldn't be knowingly waiving its sovereign immunity in those contexts.

Second, assuming sovereign immunity bars an injunction, a federal court could try to work around *Pennhurst* by issuing a declaratory judgment saying the state statute doesn't cover the challenger's conduct. But that looks like an impermissible end-run around *Pennhurst*. *See In re Ohio Execution Protocol Litig.*, 709 F. App'x 779, 782 (6th Cir. 2017) (per curiam) (holding that *Pennhurst* bars declaratory judgments); *Williams ex rel. J.E. v. Reeves*, 954 F.3d 729, 734 (5th Cir. 2020) (similar). After all, a declaratory judgment would attempt to mirror the effect of an injunction. In a subsequent state enforcement proceeding, the challenger would raise the federal declaratory judgment that the statute doesn't cover his conduct with the hope that a state court would consider itself bound by that holding. *Cf. Byler v. Air Methods Corp.*, 823 F. App'x 356, 366 (6th Cir. 2020). So a federal declaratory judgment would be an attempt to

impermissibly "instruct[] state officials on how to conform their conduct to state law." *Pennhurst*, 465 U.S. at 106. Sovereign immunity bars such an attempt.

Third, a court could simply dismiss the as-applied challenge when it finds that the statute doesn't cover the challenger's conduct. Refusing to grant relief certainly doesn't implicate sovereign immunity. That's because no remedy would run against the state. Yet dismissal could raise another problem: The state might try to enforce the statute against the challenger in state court despite the federal dismissal. And regardless of the federal court's earlier decision, the state court might conclude that the statute prohibited the challenger's conduct. In response, the challenger could try to raise his constitutional defense again and argue that the prosecution violated his First Amendment rights. But that would mean that the state court would rule on the constitutional question in the first instance—thereby depriving the challenger of a federal forum to decide that question. *Cf. Knick v. Township of Scott*, 588 U.S. 180, 194 (2019). And that might defeat the purpose of a pre-enforcement challenge. *See Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights.").[2] So what else could the challenger do?

When faced with such a prosecution, the challenger could try to argue that the federal court's earlier opinion that the state statute doesn't apply to his conduct bars enforcement because of claim preclusion. But that might be difficult. Claim preclusion often requires identical causes of action. *See, e.g., Yeoman v. Commonwealth of Ky., Health Pol'y Bd.*, 983 S.W.2d 459, 465 (Ky. 1998). And the state's enforcement proceeding probably relies on a different cause of action—enforcing a state statute—than the challenger's constitutional pre-enforcement suit. So claim preclusion might not apply.

The challenger could also try to argue that issue preclusion, another form of estoppel, bars prosecution under the statute. Generally, issue preclusion bars "relitigation of

---

[2] At the founding, though, that would not have been a problem. That's because federal courts didn't have jurisdiction over claims based on federal law until 1875. *See Stanford ex rel. Phillips v. Brandon Nursing & Rehab. Ctr., L.L.C.*, 160 F.4th 118, 125 (5th Cir. 2025) (Oldham, J., dissenting). So federal courts weren't expected to hear constitutional challenges to state laws. Instead, those challenges were normally brought in state courts.

issues . . . actually litigated and decided in a prior action between the same parties and necessary to the judgment." *Ga.-Pac. Consumer Prods. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1098 (6th Cir. 2012) (quotation omitted). So the challenger would point out that the federal court had dismissed his suit *because* it decided that the statute didn't cover his conduct. And the challenger would contend that decision binds the state court.

Assuming the court didn't decide this issue sua sponte, but rather at the request of the state, this argument could work if the claim is "actually litigated." *Firsdon v. United States*, 95 F.3d 444, 448 (6th Cir. 1996). But an issue is usually actually litigated only when the parties raise the issue during litigation. *See* Restatement (Second) of Judgments § 27 cmt. e (Am. L. Inst. 1982); *Autumn Wind Lending, LLC v. Est. of Siegel ex rel. Cecelia Fin. Mgmt., LLC*, 92 F.4th 630, 635 (6th Cir. 2024). (Of course, part of the state's argument in this case is that the rules didn't cover the candidates' conduct—so it was actually litigated here.) And an issue might not be actually litigated if the question was the "subject of a stipulation between the parties." Restatement (Second) of Judgments § 27 cmt. e. So if the parties happen to agree that the conduct isn't covered by the state law, then the issue wouldn't be actually litigated. In that instance, issue preclusion probably wouldn't apply. In any event, the decision whether to apply issue preclusion would be up to the state court—and out of the hands of the federal court. That means the state court could essentially choose whether to answer the constitutional question in the first instance.

Once the state started its prosecution, the challenger might try to get back into federal court by suing again to enjoin the state prosecution. But under the doctrine of *Younger* abstention, federal courts often refuse to enjoin ongoing state administrative proceedings once prosecution has started. *See Younger v. Harris*, 401 U.S. 37, 41 (1971); *Ohio C.R. Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 627 (1986). And with no other way to stop the state-court action, the federal court's decision to simply dismiss the as-applied challenge in the first instance might expose the challenger to state liability. That's true even if the federal court would have found that the Constitution protected his conduct.

But regardless of how these questions should come out, we don't need to resolve them here. That's because the Kentucky Judicial Conduct Commission hasn't asked for the remedy of

dismissing the candidates' as-applied challenges for failing to establish that their conduct falls into the rules. So the Commission forfeited that argument. *See Stewart v. IHT Ins. Agency Grp., LLC*, 990 F.3d 455, 457 (6th Cir. 2021). And the candidates themselves also haven't asked us to find that the ethical rules don't apply to them. That means we can proceed to address the constitutional question of whether the First Amendment protects the candidates' conduct.

IV.

The candidates raise as-applied and facial challenges to the Nominee, Endorsement, and Commitment Rules. We address each in turn.

A.

Start with the candidates' challenges to the Nominee Rule and the Endorsement Rule. As discussed, the Endorsement Rule prohibits candidates for judicial office from seeking, accepting, or using endorsements from a "political organization." Ky. Sup. Ct. R. 4.300, Rule 4.1(A)(7). And the Nominee Rule prohibits judicial candidates from holding themselves out as the nominee of a political party. Ky. Sup. Ct. R. 4.300, Rule 4.1(A)(6).

Fischer and Winter argue those rules violate their First Amendment right to free speech as applied to the speech highlighted in their complaint. In relevant part, Fischer worries that the Commission will sanction him under both the Endorsement and Nomination Rules for posting campaign signs referring to himself as "the Conservative Republican" alongside a generic image of an elephant. R. 13, Pg. ID 100. Winter has the same fear regarding signs indicating that he is a "conservative" and public statements stating that he is a "Republican." *Id.* at 106. And both candidates fear the Commission will take action against them under the Endorsement Rule for failing to disavow endorsements they received from Republican Party committees.

On the one hand, the First Amendment gives candidates "a constitutional right to portray themselves as a member of a political party." *Winter v. Wolnitzek*, 834 F.3d 681, 688 (6th Cir. 2016). On the other hand, Kentucky may constitutionally "prevent candidates from identifying themselves as *the* nominee of a political party for a judicial seat." *Id.* (emphasis in original). So the question of whether the First Amendment protects the candidates' speech turns on whether

their speech advertises them as having received the endorsement or nomination of the Republican Party. It doesn't.

As we indicated in *Fischer I*, using the term "conservative" or "Republican" or even "conservative Republican" doesn't itself communicate that candidates are the nominees of a political party. 52 F.4th at 311. Instead, those terms are simply a "shorthand" for conveying candidates' general positions on many issues at once. *Carey v. Wolnitzek*, 614 F.3d 189, 202 (6th Cir. 2010). Adding the article "the" before the phrase "conservative Republican" doesn't change that analysis. When Fischer's campaign sign advertised that he was "the conservative Republican," it didn't imply that he had received the party's nomination. *Fischer I*, 52 F.4th at 311. Instead, Fischer was plausibly communicating that out of multiple Republican candidates, he was the "conservative" option. The same goes for Winter's statements that he was also "conservative" and a "Republican." So both Winter's and Fischer's statements about their personal political affiliations were protected by the First Amendment.

Fischer's use of a generic elephant on his campaign sign also doesn't suggest a partisan endorsement or nomination. While the Republican Party's official logo is a stylized elephant with three stars on its back, Fischer's logo used a realistic depiction of an elephant's head. And the mere use of an animal symbol itself isn't enough to communicate that a candidate is the formal nominee of a party. *See id.* Even taken together—the stylized elephant alongside the text "the conservative Republican"—Fischer's statements simply conveyed his membership in a political party and his ideology. That's a long way from making a formal statement about a nomination or an endorsement. Even in nonpartisan judicial elections, the First Amendment protects candidates' rights to share information about how they will approach the issues of the day. *See Carey*, 614 F.3d at 202. That's what Fischer and Winter did through their campaign signs and messages. So to the extent the Commission applies the Nominee or Endorsement Rule to the candidates' speech, it violates the First Amendment.[3]

---

[3] Permanent injunctions still require a showing that the plaintiff will suffer irreparable injury. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). But the Commission hasn't argued that the candidates lack an irreparable injury, so it's forfeited the issue.

The candidates also argue they are entitled to a permanent injunction to stop the Commission from sanctioning them for their past failure to disavow endorsements from local Republican Party executive committees. But that fear is unfounded. The comments to the Code of Judicial Conduct make clear that candidates don't need to disavow endorsements that they receive. *See* Ky. Sup. Ct. R. 4.300, Rule 4.1 cmt. 10. The Commission agrees with this interpretation. So there's no imminent threat of enforcement based on the candidates having merely received endorsements from the Republican Party. That means they aren't entitled to an injunction against the Commission to stop it from sanctioning them for failing to disavow those endorsements.[4]

Fischer and Winter also bring facial challenges to the Nominee Rule and the Endorsement Rule. Facial challenges are difficult to win because the plaintiff must show "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) (quotation omitted). But we need not address the candidates' facial challenges because "a federal court should not extend its invalidation of a statute further than necessary to dispose of the case before it." *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 502 (1985).

In this case, declaring unconstitutional and enjoining the enforcement of the Nominee and Endorsement Rules as applied to the candidates' past conduct provides a remedy that redresses all of the imminent injury the candidates face. The candidates face the imminent injury that the Commission will sanction them for their speech during the 2022 campaign. *See Fischer II*, 78 F.4th at 868. Once we enjoin the Commission from taking enforcement action against the candidates for that past speech, the Commission may no longer bring enforcement proceedings against them. So the candidates will no longer face any imminent injury. We thus decline to

---

[4] The candidates also don't need to fear sanctions for using endorsements from right-to-life groups under the Endorsement Rule. That's because those groups are not "political organization[s]" within the meaning of Rule 4.1(A)(7). The Code of Judicial Conduct defines "political organization" as "a political party or other group sponsored by or affiliated with a political party or candidate, the principal purpose of which is to further the election or appointment of candidates for partisan political office." Ky. Sup. Ct. R. 4.300. Even though the right-to-life groups promote a pro-life message, there's no evidence that their "principal purpose" is to elect pro-life candidates to partisan office.

reach their facial challenges, and the candidates aren't entitled to an injunction against facial enforcement of the Nominee Rule or the Endorsement Rule.

In short, we (1) affirm the district court's grant of as-applied relief against the Nominee Rule, (2) reverse in part the district court's denial of as-applied relief against the Endorsement Rule, (3) affirm the district court's denial of facial relief against the Nominee Rule, and (4) reverse the district court's grant of facial relief against the Endorsement Rule.

B.

Next, the candidates challenge the Commitment Rule. The Commitment Rule bans candidates from making "pledges, promises, or commitments" if they are "in connection with cases, controversies, or issues that are likely to come before the court." Ky. Sup. Ct. R. 4.300, Rule 4.1(A)(13). Fischer and Winter worry that they will be sanctioned under this rule because they have received support from local pro-life groups—specifically, Kentucky Right to Life and Northern Kentucky Right to Life. Those groups endorsed the candidates in 2022 and affixed signs saying "Choose Life" to the candidates' campaigns signs. R. 42, Pg. ID 551–53; R. 43, Pg. ID 635–38. The candidates knew those signs had been put up and used the pro-life groups' endorsements.

The district court correctly found that the First Amendment protects this speech.[5] That's because candidates have a constitutional right to take a position on the "issues of the day" without giving explicit pledges about how they will rule. *Carey*, 614 F.3d at 193 (citing *Brown v. Hartlage*, 456 U.S. 45, 55–59 (1982)). This is precisely what "Choose Life" signs do—they take a position on the issue of abortion by communicating that the speaker is pro-life. And the same goes for the candidates' use of the pro-life groups' endorsements. Neither message constituted a pledge to rule a certain way on any upcoming case. As Fischer himself noted in a later Facebook post responding to a potential voter, judges must "put aside their personal opinions about political issues and decide each individual case based on the law as written."

---

[5] It's doubtful that much of this "Choose Life" speech can even be imputed to the candidates. As the district court acknowledged, there is no evidence they were involved in putting up the signs.

R. 13, Pg. ID 103.  So when Fischer and Winter communicated to voters that they were pro-life, they didn't guarantee how they would rule on any upcoming abortion cases in the state.

In short, the district court correctly enjoined enforcement of the Commitment Rule against the candidates for their past speech relating to abortion.  But we decline to reach the candidates' facial challenge because the remedy for their as-applied challenge fully redresses their injury.

Ultimately, speech like the candidates' comments about abortion is simply part of the bargain that states strike when they choose to make judges elected directly by the people. During judicial elections, candidates must be allowed to communicate their views so that voters know which candidates align with their own values.  And sometimes, communicating those views can get close to the line of candidates signaling to voters how they will vote in an upcoming case.  But as long as candidates don't cross that line, their speech is protected by the First Amendment.

## C.

Finally, the candidates argue that the district court erred by failing to address their purported challenge to a different ethical rule:  Rule 4.1(A)(3).  That rule prohibits judicial candidates from "publicly endors[ing] or oppos[ing] a candidate for any public office."  Ky. Sup. Ct. R. 4.300, Rule 4.1(A)(3).  But the state hasn't sought to regulate their speech under Rule 4.1(A)(3).  And we've already held that the candidates' speech is protected by the First Amendment.

\*          \*          \*

The candidates' as-applied challenges succeed, so we don't address their facial challenges.  The Commission is permanently enjoined from taking any action against the candidates for:

1.  The statement that Fischer is "the conservative Republican";
2.  The statement that Winter is "conservative" and "Republican";

3. Fischer's use of an elephant that is not the official logo of the Republican Party;

4. Kentucky Right to Life's and Northern Kentucky Right to Life's endorsements and "Choose Life" campaign signs; and

5. Fischer's and Winter's use of Kentucky Right to Life's and Northern Kentucky Right to Life's endorsements.

We affirm in part and reverse in part.

---

**CONCURRENCE / DISSENT**

---

GRIFFIN, Circuit Judge, concurring in part and dissenting in part.

The Constitution does not give federal courts "a roving commission to publicly opine on" "hypothetical or abstract" disputes. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Our authority extends only to "Cases" and "Controversies," U.S. Const. art. III, § 2—disputes that are "real, earnest, and vital," *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181, 199 (2023) (quoting *Muskrat v. United States*, 219 U.S. 346, 351 (1911)). For us to exercise that authority, a plaintiff must demonstrate an injury-in-fact caused by a defendant and redressable by a court. *Generation Changers Church v. Church Mut. Ins. Co.*, 168 F.4th 354, 361 (6th Cir. 2026). Because the candidates have not suffered an injury, they lack standing to pursue their as-applied challenges. For this reason, I respectfully dissent as to that portion of the majority opinion.

The specific injury the candidates must show is "a credible threat of enforcement," measured at the time of filing. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). That threat must have been "certainly impending." *Friends of George's, Inc. v. Mulroy*, 108 F.4th 431, 439 (6th Cir. 2024). Without a credible threat, there is no concrete harm; and "[n]o concrete harm, no standing." *TransUnion*, 594 U.S. at 417.

The majority previously held—over my dissent—that the candidates faced a credible threat and therefore could seek a preliminary injunction. *Fischer v. Thomas (Fischer I)*, 52 F.4th 303 (6th Cir. 2022). That ruling does not decide the matter now: The candidates have an obligation to independently demonstrate standing at summary judgment, which presents a much higher burden. *Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 158 F.4th 732, 741 (6th Cir. 2025) (en banc); *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). They once again fail to do so.

Whether a credible threat of enforcement exists turns on four factors: (1) "a history of past enforcement;" (2) "enforcement warning letters;" (3) the ease of enforcement; and (4) the

extent of the government's disavowal. *McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016). At summary judgment, the candidates must set forth specific evidence showing that, at the time of filing, such a threat existed. *See Murthy*, 603 U.S. at 58; *Bost v. Ill. State Bd. of Elections*, 146 S. Ct. 513, 523–24 (2026) (Barrett, J., concurring). The candidates fail at each of the *McKay* factors.

*Past Enforcement.* The Commission has enforced judicial canons against candidates before, including against Winter. *See Winter v. Wolnitzek*, 834 F.3d 681, 686 (6th Cir. 2016). So, at first blush, this factor might appear to favor standing. But past enforcement must involve the "same conduct" to constitute "good evidence that the threat of enforcement is not chimerical." *Driehaus*, 573 U.S. at 164 (citation modified). And the conduct in *Winter* was not the same. Enforcement involved different canons and applied to different speech. Moreover, the Commission operated under a different standard of proof before pursuing enforcement—only after a finding of "probable cause" would the Commission send enforcement letters. *Winter*, 834 F.3d at 686–88. And we held that a "state agency's probable cause finding provides a sufficient threat of enforcement to confer First Amendment preenforcement standing." *Id.* at 687.

But after *Winter*, the Commission replaced "probable cause" with "basis for investigation," which now guides its decision to send enforcement letters. *Fischer I*, 52 F.4th at 305. While we previously held that "basis for investigation" supported the enforcement threat, *id.* at 308, I continue to believe that was incorrect; in my view, that the Commission viewed the candidates' alleged conduct as establishing a "basis for investigation" does not mean the Commission believes a canon was violated, as it did when the Commission found probable cause. Thus, earlier instances of probable-cause enforcement do not establish a pattern of enforcement under the new "basis for investigation" standard. *See McKay*, 823 F.3d at 870 (denying standing in part because "the record [was] silent regarding any history of past enforcement of the order"). And a "prior instance of enforcement based on separate conduct" by the Commission under a different standard "does not necessarily portend a threat of later enforcement" under the new standard, which is what is at issue here. *Dutton v. Shaffer*, 171 F.4th 858, 873 (6th Cir. 2026). Accordingly, this factor weighs against the candidates.

*Enforcement Warning Letters*. An enforcement warning letter usually informs the recipient that specific conduct appears to violate a relevant rule or canon. *Berry v. Schmitt*, 688 F.3d 290, 297 (6th Cir. 2012) ("[T]he warning letter unequivocally stated that [plaintiff] had violated the rule and essentially cautioned him not to let it happen again." (citation modified)); *Kiser v. Reitz*, 765 F.3d 601, 609 (6th Cir. 2014) (holding the second *McKay* factor met when the letter explained the enforcing body had "investigated his practice and determined [it was] in violation of the regulations"). The letters here, however, only explained that complaints had been received and invited the candidates to attend informal conferences and submit written responses. They contained no "probable cause finding, nor anything else indicative of a sufficient risk of enforcement like findings of fact or assessments by the Commission or warnings about continuing the complained-of activities." *Fischer I*, 52 F.4th at 314 (Griffin, J., dissenting).

In fact, the Commission never began any preliminary investigation before the candidates brought this suit—the Commission did not investigate whether the candidates solicited endorsements, whether their statements amounted to quid pro quo commitments, or whether Fischer held himself out as the Republican nominee. Only after such an investigation does the Commission decide whether to initiate formal proceedings, hold a hearing, make findings, or issue sanctions. *See* Ky. Sup. Ct. R. 4.170(1)–(2), 4.180, 4.220, 4.260.

Contrast this with *Dutton*, where the Commission—before the plaintiff sued—sent a warning letter and a Proposed Agreed Order finding three violations. 171 F.4th at 868. Or consider *Online Merchants Guild v. Cameron*, 995 F.3d 540, 549–50 (6th Cir. 2021), where the Attorney General issued subpoenas and a formal "reason to believe" statement. Nothing similar happened here. The Commission sent letters inviting further discussion, not enforcement-warning letters, and took no further action.

The candidates argue that the letters still lead them to censor their speech. But the letters only shared that complaints were filed regarding certain canons; they did not prohibit any speech or action on the part of the candidates. And rather than respond to the Commission, the candidates elected to sue. A "personal (self-imposed) unwillingness to communicate" based on

speculation about future enforcement does not establish standing. *See ACLU v. NSA*, 493 F.3d 644, 662–63 (6th Cir. 2007). So this factor also weighs against the candidates.

*Ease of Enforcement.* The Commission's citizen-complaint mechanism makes enforcement easier. Thus, while this factor cuts against the Commission, a structural attribute of the means of enforcement, by itself, does not confer standing. *Fischer I*, 52 F.4th at 308; *McKay*, 823 F.3d at 869 (requiring a "combination" of factors).

*Refusal to Disavow.* Although the Commission has left open the possibility of formal proceedings if any future preliminary investigation yields evidence of violations, it has disclaimed application of the canons to the candidates' identified speech, never argued that the canons applied to the candidates, and has agreed with our construction of the canons. But the open complaints could result in enforcement only if the Commission completely reversed course: the Commission would have to disregard our earlier construction of the canons, conclude that the candidates' speech now actually violates the canons, and take several steps to initiate formal proceedings. Such a radical reversal rests on a "highly attenuated chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). That is a problem for the candidates— they cannot generate standing simply "based on their fears of hypothetical future harm that is not certainly impending." *Id.* at 416.

Nor does the pendency of the citizen-complaints confer standing. Although the Commission has stated that the candidates' activities, "together," "might" warrant further investigation, this statement merely suggests that the Commission might continue an internal inquiry into the citizen complaints, not that any complained-of conduct by citizens actually violates or might violate any canon. Even if this statement could be construed as an intention to enforce the law "in the abstract," it does not demonstrate a credible threat against the candidates' "specific speech." *Davis v. Colerain Township*, 51 F.4th 164, 174 (6th Cir. 2022). Moreover, the citizen-complaints' pendency is a result of the candidates' own litigation strategy—they chose to file a preemptive lawsuit rather than allowing the administrative process to run its course, and the Commission paused its inquiry into the complaints on account of this litigation. And to the extent the candidates rely on those complaints as evidence of a threat, the individual instances of speech referenced in the complaints rest on readings of the canons that the

Commission itself has rejected and that our precedent forecloses. "An argument that the [canons] might be misconstrued by" the Commission cannot generate standing. *Friends of George's, Inc.*, 108 F.4th at 438.

For these reasons, the *McKay* factors weigh against a credible threat of enforcement.

\* \* \*

At bottom, this case is "speculative fear" dressed as a constitutional dispute. *Vonderhaar v. Vill. of Evendale*, 906 F.3d 397, 401 (6th Cir. 2018). The candidates do not have an "actual and well-founded fear" of prosecution, as there is no credible threat of enforcement. *Virginia v. Am. Booksellers Ass'n Inc.*, 484 U.S. 383, 393 (1988). The majority's contrary decision pays short shrift not only to Article III's limiting principles but also to Kentucky's important state interest in enforcing its rules of professional conduct. *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 434 (1982).

That said, I concur in the judgment regarding the rejection of the candidates' facial challenges. As to the remainder, I respectfully dissent.